## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: GENERIC PHARMACEUTICALS PRICING ANTITRUST LITIGATION | MDL 2724<br>16-MD-2724<br>HON. CYNTHIA M. RUFE |
| RELIABLE PHARMACY, INC.;<br>HALLIDAY'S & KOIVISTO'S PHARMACY;<br>RUSSELL'S MR. DISCOUNT DRUGS, INC.;<br>FALCONER PHARMACY, INC.; and<br>CHET JOHNSON DRUG, INC.;<br>   on behalf of themselves and all others<br>   similarly situated,<br>               *Plaintiffs*,<br><br>        v.<br><br>ACTAVIS HOLDCO US, INC.;<br>ACTAVIS PHARMA, INC.;<br>ACTAVIS ELIZABETH LLC;<br>AMNEAL PHARMACEUTICALS, INC.;<br>AMNEAL PHARMACEUTICALS LLC;<br>ARA APRAHAMIAN;<br>AUROBINDO PHARMA USA, INC.;<br>MITCHELL BLASHINSKY;<br>DOUGLAS BOOTHE;<br>FOUGERA PHARMACEUTICALS INC;<br>GLENMARK PHARMACEUTICALS, INC.;<br>JAMES "JIM" GRAUSO;<br>GREEENSTONE LLC;<br>G & W LABORATORIES;<br>WALTER KACZMAREK;<br>ARMANDO KELLUM;<br>LUPIN PHARMACEUTICALS, INC.;<br>MYLAN INC.;<br>MYLAN PHARMACEUTICALS, INC.;<br>MYLAN N.V.;<br>KURT ORLOFSKI;<br>MICHAEL PERFETTO;<br>PERRIGO NEW YORK, INC;<br>PFIZER INC.;<br>SANDOZ, INC.;<br>SUN PHARMACEUTICAL INDUSTRIES, INC;<br>TARO PHARMACEUTICALS U.S.A., INC.;<br>ERIKA VOGEL-BAYLOR<br>JOHN WESOLOWSKI; and<br>WOCKHARDT USA LLC;<br>               *Defendants.* | # 20-cv-6291<br><br><br>**Pharmacy and Hospital Plaintiffs' ("IRP") December 2020**<br><br>**COMPLAINT**<br><br><br><br>JURY TRIAL DEMANDED<br><br>CLASS ACTION |

**FILED WITH REDACTIONS – PUBLIC VERSION**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................7

JURISDICTION AND VENUE ............................................................................................8

PARTIES ................................................................................................................................9

    A.    Pharmacy Plaintiffs ..............................................................................................9

    B.    Manufacturer Defendants....................................................................................11

        1.    Actavis ....................................................................................................11

        2.    Amneal ....................................................................................................12

        3.    Aurobindo ...............................................................................................12

        4.    Glenmark .................................................................................................12

        5.    G&W .......................................................................................................13

        6.    Lupin .......................................................................................................13

        7.    Mylan ......................................................................................................13

        8.    Perrigo .....................................................................................................13

        9.    Pfizer / Greenstone.................................................................................14

        10.    Sandoz / Fougera....................................................................................14

        11.    Sun ..........................................................................................................16

        12.    Taro .........................................................................................................16

        13.    Wockhardt ...............................................................................................16

    C.    Individual Defendants.........................................................................................16

        1.    Ara Aprahamian (Actavis, Taro) ...........................................................16

        2.    Mitchell "Mitch" Blashinsky (Taro, Glenmark)....................................17

        3.    Douglas Boothe (Actavis, Perrigo, Impax, Akorn)................................17

        4.    James "Jim" Grauso (G&W, Aurobindo, Glenmark) ..............................18

        5.    Walter "Walt" Kaczmarek (Fougera, Mallinckrodt) ..............................18

**FILED WITH REDACTIONS – PUBLIC VERSION**

6.       Armando Kellum (Sandoz) ..................................................................18

7.       Kurt Orlofski (G&W) ........................................................................19

8.       Michael Perfetto (Actavis, Taro) .......................................................19

9.       Erika Vogel-Baylor (G&W) ...............................................................20

10.     John Wesolowski (Perrigo)................................................................20

FACTUAL ALLEGATIONS .............................................................................................21

     A.      **The Generic Drug Industry's Overarching "Fair Share" Conspiracy** ..........21

           1.      The rules of the fair share conspiracy .........................................24

           2.      The logic of the fair share conspiracy .........................................27

           3.      The terminology of the fair share conspiracy ...............................30

           4.      The scope and impact of the fair share conspiracy ......................33

           5.      Defendants actively concealed the conspiracy ...........................37

     B.      **The Initial Collusive Relationships**..........................................................38

           CW-6 (Fougera), T.P. (Perrigo) & H.M. (Taro) .......................................38

           Michael Perfetto and M.D. (Actavis) relationships with Mitchell
           Blashinsky (Taro) and T.P. (Perrigo)..........................................................40

           CW-4 (Sandoz) & D.S. (Taro) ...................................................................40

     C.      **Early Episodes in the Conspiracy: Sandoz/Fougera and Taro**.......................42

           1.      Triamcinolone Acetonide Cream and Ointment (Fougera, Perrigo) .........42

           2.      Adapalene Cream (Fougera, Perrigo) ..........................................43

           3.      Clotrimazole-Betamethasone Dipropionate Cream and Lotion (Actavis,
           Sandoz/Fougera, Taro)..............................................................................44

           4.      Fluocinonide solution (Actavis, Taro, Fougera) .........................46

           5.      Erythromycin Base / Ethyl Alcohol Solution (Fougera, Perrigo,
           Wockhardt) ...............................................................................................48

     D.      **Early Episodes in the Conspiracy: G&W** ...............................................51

           6.      Metronidazole 0.75% Cream and Lotion (Actavis, Fougera, G&W)........53

           7.      Calcipotriene Solution (Fougera, G&W) ....................................53

**FILED WITH REDACTIONS – PUBLIC VERSION**

8.      Fluocinolone Acetonide Cream and Lotion (Fougera, G&W) .................54

9.      Metronidazole 0.75% Gel (G&W, Fougera, Sandoz, Taro) .....................55

10.    Ciclopirox Cream (Glenmark, G&W, Perrigo)..........................................56

E.      **The Evolution of Collusive Relationships** ...........................................57

CW-3 (Sandoz) & Aprahamian ...............................58

CW-4 (Sandoz) & D.S. (Taro) .................................59

CW-3 (Sandoz) & T.P. (Perrigo) .............................59

Perfetto (Actavis) & Boothe (Perrigo) ....................60

F.      Sandoz Management Encouraged Collusion with Competitors ...........................60

11.    Desonide Lotion (Actavis, Fougera).......................................................61

12.    Ciclopirox Shampoo (Actavis, Perrigo, Sandoz, Taro) ...........................63

G.      **Taro's Coordination of May 2013 Price Increases** ...........................................64

H.      **More Collusive Episodes Involving Taro**..........................................................68

13.    Alclometasone Dipropionate ointment (Taro, Sandoz, Glenmark) ..........68

14.    Fluocinonide solution (Actavis, Sandoz, Taro) .....................................69

15.    Triamcinolone Acetonide paste (Rising, Taro)........................................70

16.    Phenytoin Sodium ER capsules (Amneal, Mylan, Taro, Sun)..................71

17.    Metronidazole .1% gel (Amneal, Mylan, Taro, Sun) ...............................72

18.    Clotrimazole 1% Cream (Sandoz, Taro)................................................73

I.      **Collusion between Perrigo and Sandoz**............................................................74

19.    Bromocriptine Mesylate Tablets (Perrigo, Sandoz)................................74

20.    Adapalene Cream (Perrigo, Sandoz)......................................................75

21.    Calcipotriene-Betamethasone Dipropionate Ointment (Perrigo, Sandoz).77

22.    Tacrolimus Ointment (Perrigo, Sandoz).................................................78

23.    Methazolamide Tablets (Perrigo, Sandoz).............................................79

J.      **Collusion between Glenmark and Sandoz** .......................................................80

FILED WITH REDACTIONS – PUBLIC VERSION

24. Fluticasone Propionate Lotion (Glenmark, Perrigo, Sandoz)...................81

25. Desoximetasone Ointment (Glenmark, Sandoz, Taro) ..............................83

K. **Collusion between Aurobindo and Sandoz** .......................................85

26. Oxacillin Sodium, Nafcillin Sodium Injectable Vials (Aurobindo, Sandoz) ..............................................................................................85

27. Cefpodoxime Proxetil Oral Suspension and Tablets (Aurobindo, Sandoz) ..............................................................................................86

L. **Collusion between Rising and Sandoz** .............................................88

28. Griseofulvin Microsize Tablets (Rising, Sandoz)......................................88

M. **Collusion between Mallinckrodt and Sandoz** .................................89

29. Methylphenidate Immediate Release and Extended Release Tablets (Actavis, Mallinckrodt, Sandoz, Sun) ........................................................89

N. **Collusion between Greenstone/Pfizer and Sandoz** ...........................91

30. Clindamycin Phosphate Cream, Gel, Lotion, and Solution (Greenstone, Perrigo, Sandoz, Taro) .............................................................93

O. **Collusion between G&W and other manufacturers** ............................98

31. Halobetasol Propionate Cream and Ointment (G&W, Perrigo, Sandoz, Taro)..........................................................................................99

32. Prochlorperazine Maleate Suppositories (G&W, Perrigo) .....................102

33. Ciclopirox Solution (G&W, Perrigo, Sandoz).........................................103

34. Hydrocortisone Acetate Suppositories (G&W, Perrigo) .........................104

35. Promethazine HCL Suppositories (Actavis, G&W, Perrigo) .................105

36. Ciclopirox Cream and Mometasone Furoate cream, ointment and solution (G&W, Glenmark, Perrigo) .....................................................107

37. Ethambutol HCL tablets (G&W, Lupin) .................................................108

THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS ....................110

DEFENDANTS' ANTITRUST VIOLATIONS................................................................112

CLASS ACTION ALLEGATIONS .............................................................................114

CAUSES OF ACTION .............................................................................................118

FILED WITH REDACTIONS – PUBLIC VERSION

COUNT 1 Violation of the Sherman Act—Injunctive Relief ...........................118

COUNT 2 Violation of State Antitrust Statutes ..................................................120

COUNT 3 Violation of State Consumer Protection Statutes...............................124

COUNT 4 Unjust Enrichment ............................................................................128

REQUEST FOR RELIEF ...............................................................................................131

JURY DEMAND ............................................................................................................132

APPENDIX A:  DRUGS AT ISSUE IN THIS COMPLAINT ....................................133

APPENDIX B: MANUFACTURER DEFENDANTS IN IRP COMPLAINTS IN MDL 2724.135

**FILED WITH REDACTIONS – PUBLIC VERSION**

## INTRODUCTION

1.       Defendants, generic drug manufacturers, have participated in an overarching conspiracy to maintain and raise prices of more than a hundred generic drugs and to allocate customers and drug markets between manufacturers in order to assign each Defendant manufacturer its "fair share" of business while keeping prices high.

2.       Plaintiffs are independent pharmacies and hospitals that purchased and later dispensed these drugs, and, due to Defendants' antitrust violations, were forced to pay illegally inflated prices for these drugs. Plaintiffs have previously filed actions in this multi-district litigation, MDL 2724.[1] This complaint focuses on topical products and seeks relief for drug formulations that do not appear in Plaintiffs' previously-filed MDL 2724 actions.

3.       Defendants met in person and called, emailed, and texted one another in order to coordinate the tactical details of their overarching anticompetitive strategy. They exchanged confidential pricing and launch plans, targeted or ceded certain accounts in order to allocate customers, agreed to lead or follow list price increases or effective price increases, and submitted false bids. This fair share conspiracy affected the prices of the drugs already identified in Plaintiffs' previously-filed MDL 2724 actions as well as the Drugs at Issue[2] identified here.

---

[1] The actions previously filed by IRP Plaintiffs in MDL 2724 include: **Albuterol** (16-AL-27243-CMR, Dkt. 2); **Amitriptyline** (16-AM-27243-CMR, Dkt. 2); **Baclofen** (16-BC-27243-CMR, Doc. 9); **Benazepril** (16-BZ-27243-CMR, Dkt. 2); **Clobetasol** (16-CB-27243-CMR, Dkt. 13); **Clomipramine** (16-CM-27243-CMR, Dkt. 2); **Desonide** (16-DS-27243-CMR, Dkt. 12); **Digoxin** (16-DG-27243-CMR, Dkt. 34); **Divalproex** (16-DV-27243-CMR, Dkt. 6); **Doxycycline** (16-DX-27243-CMR, Dkt. 39); **Econazole** (16-EC-27243-CMR, Dkt. 2); **Fluocinonide** (16-FL-27243-CMR, Dkt. 10); **Levothyroxine** (16-LV-27243-CMR, Dkt. 8); **Lidocaine-Prilocaine** (16-LD-27243-CMR, Dkt. 12); **Pravastatin** (16-PV-27243-CMR, Dkt. 9); **Propranolol** (16-PP-27243-CMR, Dkt. 5); and **Ursodiol** (16-FL-27243-CMR, Dkt. 8), a **multi-drug "Overarching"** complaint (18-cv-2533-CMR, Dkt. 1) focused on Heritage that sought relief for overcharges on over a dozen drugs and/or drug formulations; and a **multi-drug "December 2019"** complaint (19-CV-6044-CMR, Dkt. 61) focused on Teva that sought relief for overcharges on more than 130 drugs and also included claims against generic drug distributors.
[2] The Drugs at Issue for purposes of this complaint are identified in Appendix A.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action as it arises under

Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

Further, this Court has jurisdiction under 28 U.S.C. §§ 1331, 1337(a).

5.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15 and 22, and 28 U.S.C.

§ 1391(b), (c) and (d), because during the Class Period Defendants transacted business

throughout the United States, including in this District; Defendants resided, transacted business,

were found, or had agents within this District, and a portion of the affected interstate trade and

commerce discussed below was carried out in this District.

6.     This Court has personal jurisdiction over each Defendant because each

Defendant: (a) transacted business throughout the United States, including in this District;

(b) participated in the selling and distribution of Drugs at Issue throughout the United States,

including in this District; (c) had and maintained substantial contacts within the United States,

including in this District; and/or (d) was engaged in an unlawful conspiracy to inflate the prices

for Drugs at Issue that was directed at and had the intended effect of causing injury to persons

residing in, located in, or doing business throughout the United States, including in this District.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## PARTIES

**A.    Pharmacy Plaintiffs**

7.    Plaintiff **Reliable Pharmacy, Inc.** ("Reliable") is a privately-held independent pharmacy located in Northridge, California. During the Class Period, Reliable purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.[3]

8.    Plaintiff **Falconer Pharmacy, Inc**. ("Falconer") is a privately held independent pharmacy located in Falconer, New York. During the Class Period, Falconer purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.[4]

[3] Specifically, Reliable purchased Adapalene cream, Alclometasone dipropionate cream and ointment, Allopurinol tablets, Amantadine HCL capsules, Ammonium lactate cream and lotion, Atenolol-Chlorthalidone tablets, Betamethasone valerate lotion, Bromocriptine mesylate tablets, Calcipotriene-Betamethasone dipropionate ointment, Calcipotriene solution, Captopril tablets, Cefpodoxime proxetil tablets, Cefuroxime axetil tabs, Chlorpromazine HCL tabs, Ciclopirox cream, shampoo, and solution, Clindamycin phosphate gel, lotion, solution, and vaginal cream, Clotrimazole-Betamethasone dipropionate cream and lotion, Clotrimazole cream, Desonide lotion, Desoximetasone ointment, Ethambutol HCL tablets, Fluocinolone acetonide cream and ointment, Fluocinonide solution, Griseofulvin microsize tablets, Halobetasol propionate cream and ointment, Hydrocortisone acetate suppositories, Methazolamide tablets, Methylphenidate HCL ER tablets and IR tablets, Metronidazole 1%  gel, .75% lotion, and .75% cream, Mometasone furoate cream, ointment, and solution, Phenytoin sodium capsules, Prochlorperazine maleate suppositories, Promethazine HCL suppositories, Tacrolimus ointment, Terconazole cream, and Triamcinolone acetonide cream, ointment, and paste.

[4] Specifically, Falconer purchased Adapalene cream, Alclometasone dipropionate cream and ointment, Allopurinol tablets, Ammonium lactate cream and lotion, Atenolol-Chlorthalidone tablets, Captopril tablets, Cefpodoxime proxetil tablets, Cefuroxime axetil tabs, Ciclopirox cream and solution, Clindamycin phosphate gel, lotion, solution, and vaginal cream, Clotrimazole-Betamethasone dipropionate cream and lotion, Clotrimazole cream, Desonide lotion, Fluocinonide solution, Halobetasol propionate cream and ointment, Methazolamide tablets, Methylphenidate HCL ER tablets and IR tablets, Metronidazole 1%  gel, .75% lotion, and .75% cream, Mometasone furoate cream, ointment, and solution, Phenytoin sodium capsules, Terconazole cream, and Triamcinolone acetonide cream, ointment, and paste.

**FILED WITH REDACTIONS – PUBLIC VERSION**

9.      Plaintiff **Halliday's & Koivisto's Pharmacy** ("Halliday's") is an independent pharmacy located at 4133 University Boulevard in Jacksonville, Florida. Halliday's has served the Jacksonville community for over 50 years. During the Class Period, Halliday's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct. [5]

10.     Plaintiff **Russell's Mr. Discount Drugs, Inc.** ("Russell's") was a privately held independent pharmacy located at 334 Depot Street, in Lexington, Mississippi from the time of its opening in February 1986 until it sold the prescription drugs portion of its business to a pharmacy chain on July 14, 2016. During the Class Period, Russell's purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.[6]

11.     Plaintiff **Chet Johnson Drug, Inc.** ("Chet Johnson") is a privately held independent pharmacy in Amery, Wisconsin. During the Class Period Chet Johnson purchased drugs affected by the anticompetitive conduct at issue in this complaint at supracompetitive

---

[5] Specifically, Halliday's purchased Allopurinol tablets, Amantadine HCL capsules, Ammonium lactate cream and lotion, Atenolol-Chlorthalidone tablets, Chlorpromazine HCL tabs, Ciclopirox solution, Clotrimazole-Betamethasone dipropionate cream, Clotrimazole cream, Desonide lotion, Desoximetasone ointment, Fluocinolone acetonide cream and ointment, Fluocinonide solution, Griseofulvin microsize tablets, Halobetasol propionate cream and ointment, Hydrocortisone acetate suppositories, Methylphenidate HCL ER tablets and IR tablets, Metronidazole 1% gel, .75% lotion, and .75% cream, Mometasone furoate cream, ointment, and solution, Phenytoin sodium capsules, Promethazine HCL suppositories, Terconazole cream, and Triamcinolone acetonide cream, ointment, and paste.

[6] Specifically, Russell's purchased Allopurinol tablets, Amantadine HCL capsules, Ammonium lactate lotion, Atenolol-Chlorthalidone tablets, Chlorpromazine HCL tabs, Ciclopirox solution, Clotrimazole-Betamethasone dipropionate cream, Fluocinonide solution, Hydrocortisone acetate suppositories, Metronidazole 1% gel, Mometasone furoate cream, Phenytoin sodium capsules, and Triamcinolone acetonide cream and ointment.

**FILED WITH REDACTIONS – PUBLIC VERSION**

prices and was thereby injured and suffered damages as a result of Defendants' unlawful conduct.[7]

B.    **Manufacturer Defendants**

    1.  *Actavis*

12.    Defendant **Actavis Holdco U.S., Inc.** ("Actavis") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. In August 2016, Teva Pharmaceutical USA, Inc. acquired the generics business of Allergan plc, including Actavis, Inc. Upon the acquisition, Actavis, Inc.—the acquired Allergan plc generics operating company (formerly known as Watson Pharmaceuticals)—was renamed Allergan Finance, LLC, which in turn assigned all of the assets and liabilities of the former Allergan plc generic business to the newly formed Actavis Holdco, including subsidiaries Defendant Actavis Pharma, Inc. and Defendant Actavis Elizabeth LLC, among others. Actavis Holdco is a wholly-owned subsidiary of Teva Pharmaceuticals USA, Inc., which is a defendant in Plaintiffs' other MDL 2724 complaints.

13.    Defendant **Actavis Pharma, Inc.** ("Actavis Pharma") is a Delaware corporation with its principal place of business in Parsippany, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco and is a principal operating company in the U.S. for Teva's generic products

---

[7] Specifically, Chet Johnson purchased Adapalene cream, Allopurinol tabs, Amantadine HCL capsules, Ammonium lactate cream and lotion, Atenolol-Chlorthalidone tablets, Betamethasone valerate lotion, Bromocriptine mesylate tablets, Calcipotriene solution, Captopril tablets, Cefuroxime axetil tabs, Chlorpromazine HCL tabs, Ciclopirox cream, shampoo, and solution, Clindamycin phosphate gel, lotion, solution, and vaginal cream, Clotrimazole-Betamethasone dipropionate cream, Clotrimazole cream, Desonide lotion, Desoximetasone ointment, Ethambutol HCL tablets, Fluocinonide solution, Griseofulvin microsize tablets, Hydrocortisone acetate suppositories, Methazolamide tablets, Methylphenidate HCL ER tablets and IR tablets, Metronidazole 1% gel, .75% lotion, and .75% cream, Mometasone furoate cream, ointment, and solution, Phenytoin sodium capsules, Prochlorperazine maleate suppositories, Promethazine HCL suppositories, Tacrolimus ointment, Terconazole cream, and Triamcinolone acetonide cream, ointment, and paste.

**FILED WITH REDACTIONS – PUBLIC VERSION**

acquired from Allergan plc. Actavis Pharma, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

14.    Defendant **Actavis Elizabeth LLC** ("Actavis Elizabeth") is a Delaware company with its principal place of business in Elizabeth, New Jersey. It is a wholly-owned subsidiary of Actavis Holdco.

15.    Unless addressed individually, Actavis Holdco, Actavis Pharma, and Actavis Elizabeth are collectively referred to herein as "Actavis."

### 2. *Amneal*

16.    Defendant **Amneal Pharmaceuticals LLC** ("Amneal LLC") is a Delaware company with its principal place of business in Bridgewater, New Jersey.

17.    Defendant **Amneal Pharmaceuticals Inc.** ("Amneal Inc.") is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Amneal Inc. owns a portion of Amneal LLC and, as the managing member of Amneal LLC, conducts and exercises full control over all activities of Amneal LLC.

18.    Unless addressed individually, Amneal LLC and Amneal Inc. are collectively referred to herein as "Amneal."

### 3. *Aurobindo*

19.    Defendant **Aurobindo Pharma USA, Inc.** ("Aurobindo") is a Delaware corporation with its principal place of business in Dayton, New Jersey. Aurobindo is a subsidiary of Aurobindo Pharma Limited, a corporation based in Hyderabad, India.

### 4. *Glenmark*

20.    Defendant **Glenmark Pharmaceuticals, Inc.** ("Glenmark") is a Delaware corporation with its principal place of business in Mahwah, New Jersey. It is a wholly-owned

**FILED WITH REDACTIONS – PUBLIC VERSION**

subsidiary of Glenmark Pharmaceuticals Ltd., headquartered in Mumbai, in the state of

Maharashtra, India.

### 5. *G&W*

21.     Defendant **G&W Laboratories, Inc.** ("G&W") is a New Jersey corporation with

its principal place of business in South Plainfield, New Jersey.

### 6. *Lupin*

22.     Defendant **Lupin Pharmaceuticals, Inc.** ("Lupin") is a Delaware corporation

that has its principal place of business in Baltimore, Maryland. Lupin is a wholly-owned

subsidiary of Lupin Limited, an Indian company with its principal place of business in Mumbai,

India.

### 7. *Mylan*

23.     Defendant **Mylan Inc.** is a Pennsylvania corporation with its principal place of

business in Canonsburg, Pennsylvania.

24.     Defendant **Mylan Pharmaceuticals, Inc.** is a West Virginia corporation with its

principal place of business in Morgantown, West Virginia. It is a subsidiary of Mylan Inc. Mylan

Pharmaceuticals, Inc. is registered with the Pennsylvania Department of State as a foreign

corporation and maintains a registered agent in Pennsylvania.

25.     Mylan Inc. and Mylan Pharmaceuticals, Inc. are wholly-owned subsidiaries of

Defendant **Mylan N.V.**, a Dutch pharmaceutical company. Unless addressed individually, Mylan

Inc., Mylan Pharmaceuticals, Inc., and Mylan N.V. are collectively referred to herein as

"Mylan."

### 8. *Perrigo*

26.     Defendant **Perrigo New York, Inc.** ("Perrigo") is a Delaware corporation with its

executive offices in Allegan, Michigan and its primary business location in the Bronx, New

FILED WITH REDACTIONS – PUBLIC VERSION

York. It is a subsidiary of Perrigo Company plc, an Irish company with its principal place of business in Dublin, Ireland. Perrigo is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

### 9. *Pfizer / Greenstone*

27.     Defendant **Greenstone LLC** ("Greenstone") is a limited liability company with its principal place of business in North Peapack, New Jersey.

28.     Greenstone is a wholly-owned subsidiary of Defendant **Pfizer Inc.** ("Pfizer"), a Delaware corporation with its principal place of business in New York, New York. At all relevant times Greenstone has operated as the generic drug division of Pfizer. Greenstone operates out of Pfizer's Peapack, New Jersey campus, and a majority of Greenstone's employees are also employees of Pfizer's Essential Health Division, including Greenstone's President. Greenstone employees also use Pfizer for financial analysis, human resources, and employee benefit purposes, making the two companies essentially indistinguishable. During the Class Period, Greenstone and Pfizer marketed and sold generic pharmaceuticals in this District and throughout the United States.

### 10. *Sandoz / Fougera*

29.     Defendant **Sandoz, Inc.** is a Colorado corporation with its principal place of business in Princeton, New Jersey. Sandoz, Inc. is a subsidiary of Novartis AG, a global pharmaceutical company based in Basel, Switzerland. Sandoz, Inc. is registered with the Pennsylvania Department of State as a foreign corporation and maintains a registered agent in Pennsylvania.

30.     Sandoz's former Director of Contracts and Pricing, Defendant Armando Kellum, has pleaded guilty to federal criminal price-fixing charges.

31.     Defendant **Fougera Pharmaceuticals Inc.** ("Fougera") is a New York corporation with its principal place of business in Melville, New York. Fougera is a wholly-owned subsidiary of Defendant Sandoz, Inc. In 2012, Sandoz acquired and integrated Fougera into its US-based generic pharmaceutical business.

32.     Unless addressed individually, Fougera and Sandoz, Inc. are collectively referred to henceforth as "Sandoz."

33.     Sandoz admits that it participated in a multi-year, multi-drug conspiracy to fix generic drug prices. On March 2, 2020 Sandoz, Inc. was criminally charged by the Department of Justice and entered into a deferred prosecution agreement ("DPA").

34.     In the Statement of Facts attached to the DPA, Sandoz admits that it conspired with four other manufacturers (Taro, Rising, Perrigo, and Teva) to "to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs." At a minimum, Sandoz admits that it:

- Conspired with Taro from March 2013 until at least December 2015 to fix prices of Clobetasol cream, emollient cream, gel, ointment, and solution, Desonide ointment, and Nystatin-Triamcinolone cream.

- Conspired with Rising from April 2014 until at least September 2015 to fix prices of Benazepril-HCTZ.

- Conspired with Perrigo from July 2013 until at least December 2015 to fix prices of Desonide ointment.

- Conspired with Teva from July 2013 until at least December 2015 to fix prices of Tobramycin.

In the DPA, Sandoz acknowledges that "it is responsible for the acts…that give rise to the charges" and "admits, accepts, and acknowledges that the facts" in the agreement "are true and accurate." Sandoz agreed "that it will neither contest the admissibility of, nor contradict, any of the facts."

FILED WITH REDACTIONS – PUBLIC VERSION

**11.** *Sun*

35.    Defendant **Sun Pharmaceutical Industries, Inc.** ("SPII") is a Michigan corporation with its principal place of business in Cranbury, New Jersey. SPII is a wholly-owned subsidiary of Sun Pharmaceutical Industries Ltd. ("Sun Pharma"), an Indian corporation, which also owns a majority stake in Taro Pharmaceutical Industries, Ltd., and Taro's U.S. subsidiary, Taro Pharmaceuticals USA, Inc.

**12.** *Taro*

36.    Defendant **Taro Pharmaceuticals U.S.A., Inc.** ("Taro") is a New York corporation with its principal place of business in Hawthorne, New York. Taro is a wholly-owned subsidiary of Taro Pharmaceutical Industries, Ltd., an Israeli entity, which in turn is majority owned by Defendant Sun Pharmaceutical Industries, Inc.

37.    On July 23, 2020, in a DPA with the Department of Justice, Taro admitted that it had engaged in a price-fixing conspiracy with at least Teva and Sandoz.

**13.** *Wockhardt*

38.    Defendant **Wockhardt USA LLC** ("Wockhardt") is a Delaware limited liability company, with its principal place of business in Parsippany, New Jersey.

**C.    Individual Defendants**

**1.** *Ara Aprahamian* (Actavis, Taro)

39.    Defendant **Ara Aprahamian** is an individual residing in Bardonia, New York. He was Director of Pricing & Contracting at Defendant Actavis from August 2010 to March 2013, and was the VP of Sales and Marketing at Defendant Taro from March 2013 to August 2018.

FILED WITH REDACTIONS – PUBLIC VERSION

40.     On February 4, 2020, Aprahamian was indicted for two violations of 15 U.S.C. §
1 (the Sherman Act) and one violation of 18 U.S.C. § 1001(a)(2), which criminalizes deliberately
lying to federal investigators.

41.     The indictment charges that Aprahamian formed agreements with co-conspirators
in the generic drug manufacturing industry to increase prices and to allocate customers for
numerous drugs from at least as early as March 2013 until at least December 2015.  The
indictment specifically describes agreements Aprahamian made with Defendant Sandoz regarding
Clotrimazole cream, Desonide ointment, Fluocinonide ointment, Lidocaine ointment, and
Nystatin-Triamcinolone cream and ointment, and with another generic manufacturer, Teva, which
was itself indicted for multiple Sherman Act violations on August 25, 2020.

### 2.   Mitchell "Mitch" Blashinsky (Taro, Glenmark)

42.     Defendant **Mitchell Blashinsky** is an individual residing in Monroe Township,
New Jersey. Blashinsky was VP of Marketing for Generics at Taro Pharmaceuticals USA from
January 2007 to May 2012 and then became VP of Sales and Marketing at Glenmark
Pharmaceuticals Inc., USA.

### 3.   Douglas Boothe (Actavis, Perrigo, Impax, Akorn)

43.     Defendant Douglas Boothe is an individual residing in Chester, New Jersey.
Boothe was CEO of Actavis from August 2008 to December 2012 was later Executive VP and
General Manager for Pharmaceuticals at Perrigo from January 2013 to July 2016. He then became
CEO of Impax and is presently the CEO of Akorn. Plaintiffs allege that all four of the generic
companies led by Boothe participated in the conspiracy.

**FILED WITH REDACTIONS – PUBLIC VERSION**

4. ***James "Jim" Grauso*** *(G&W, Aurobindo, Glenmark)*

44.     Defendant **James Grauso** is an individual residing in Ramsey, New Jersey. Grauso was VP of Sales and Marketing at G&W from January 2010 to December 2011. He then became Senior VP of Commercial Operations at Aurobindo from December 2011 to January 2014. Since January 2014, Grauso has been Executive VP for North American Commercial Operations at Defendant Glenmark.

5. ***Walter "Walt" Kaczmarek*** *(Fougera, Mallinckrodt)*

45.     Defendant **Walter "Walt" Kaczmarek** is an individual residing in Longboat Key, Florida. Kaczmarek held Senior Director, Vice President, and Senior Vice President roles at Defendant Fougera from November 2004 to November 2012. Kaczmarek was also Vice President and President at co-conspirator Mallinckrodt from November 2013 to August 2016.

6. ***Armando Kellum*** *(Sandoz)*

46.     Defendant **Armando Kellum** is an individual residing in Huntingdon Valley, Pennsylvania. Kellum was the Vice President, Contracting and Business Analytics at Defendant Sandoz.

47.     On February 14, 2020, Kellum pleaded guilty to a violation of Section 1 of the Sherman Act (15 U.S.C. § 1). The criminal information charges that from at least as early as March 2013, and continuing until at least June 2015, Kellum, on behalf of Sandoz, along with Defendant Ara Aprahamian and co-conspirators at Sandoz and Defendant Taro, "knowingly entered into and engaged in a conspiracy to suppress and eliminate competition by agreeing to allocate customers and rig bids for, and stabilize, maintain, and fix prices of, generic drugs sold in the United States."

**FILED WITH REDACTIONS – PUBLIC VERSION**

48.      The information charges that Kellum worked with Aprahamian and co-conspirators at Sandoz and Taro to discuss drug launches that either company planned to make on generic drugs that the other was already in the market for, including the soliciting and relinquishing of customers.  Kellum would then agree with his co-conspirators on which customers the launching company would solicit, so as to allow "the launching company to obtain customers quickly at the highest price possible, and minimize the decline of price for the drugs being launched."  Such discussions could include the "dead net price(s)" for certain customers of the drug.

49.      The information also notes that Kellum, other co-conspirators at Sandoz, and Aprahamian agreed to increase prices of certain generic drugs by discussing the amount of the increase, receiving non-public prices for Taro's various classes of trade, and declining requests for bids from Taro's customers.

### 7.   *Kurt Orlofski* (G&W)

50.      Defendant **Kurt Orlofski** is an individual residing in Mountain Lakes, New Jersey. Orlofski was President of G&W from September 2009 to December 2016.

### 8.   *Michael Perfetto* (Actavis, Taro)

51.      Defendant **Michael Perfetto** is an individual residing in Conklin, New York. Perfetto was the VP of Sales and Marketing of Defendant Actavis from August 2003 to January 2013. He then became the Chief Commercial Officer of Defendant Taro Pharmaceuticals USA, Inc.

**FILED WITH REDACTIONS – PUBLIC VERSION**

**9.** *Erika Vogel-Baylor* *(G&W)*

52.     Defendant **Erika Vogel-Baylor** is an individual residing in Milford, New Jersey.

At all times relevant to this complaint, Vogel-Baylor was VP of Sales and Marketing at

Defendant G&W.

**10.** *John Wesolowski* *(Perrigo)*

53.     Defendant **John Wesolowski** is an individual residing in Delton, Michigan. Since

February 2004, Wesolowski has worked for Defendant Perrigo as Senior Vice President of

Commercial Operations.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## FACTUAL ALLEGATIONS

A.    **The Generic Drug Industry's Overarching "Fair Share" Conspiracy**

54.    Defendants have each participated in a mutually-established code of conduct that was intentionally developed to allow generic drug manufacturers to curtail or eliminate free and fair competition and thus artificially maintain and inflate generic drug prices. Plaintiffs, pharmacies and hospitals that purchase and dispense these drugs, seek relief in this action because they have been forced to pay and continue to pay supracompetitive prices for the Drugs at Issue[8] and also suffer actual losses when they dispense the drugs without being reimbursed for the artificially-high cost.

55.    The foundational premise of the Defendants' illegal agreement is the idea of "fair share." Fair share is an understanding that each manufacturer of a given drug is entitled to a proportional market share—a certain percentage of the sales—of that drug market. Defendants all agree it is greedy and irresponsible to compete beyond one's fair share, because competition forces manufacturers to lower their prices to retain the same supply contracts.

56.    This type of market allocation agreement is a classic "conspiracy in restraint of trade" forbidden by the federal Sherman Act, 15 U.S.C. § 1, and the antitrust statutes of every state and territory. Defendants have no reasonable pro-competitive justification for discussions of market share targets between generic drug manufacturers, for encouraging competitors to follow price increases, or for promising to follow price increases.

57.    The Defendants reinforced their overarching agreement at industry conferences, private dinners, cocktail nights, and golf outings, and via calls, emails, texts, and private app

---

[8] The Drugs at Issue in this Complaint are listed in Appendix A on page 136.

**FILED WITH REDACTIONS – PUBLIC VERSION**

messages when they could not speak in person. Conversations between competitors discussing customer allocation, cover bids, specific nonpublic prices, and future price increases are so pervasive among the Defendants that some conspirators did not even question whether their arrangements were illegal despite being warned to conceal their communications.

58.    This Court has already recognized that "Plaintiffs have sufficiently alleged the existence of an overarching conspiracy" by generic drug manufacturers, including all of the Defendants named in this action, based on the principles of fair share. *See In re Generic Pharmaceuticals Pricing Antitrust Litigation*, 16-md-2724, Dkt. 1070 (E.D. Pa. Aug. 15, 2019). This Court held that Plaintiffs' earlier complaints sufficiently alleged "a single conspiracy with a common goal, facilitated by multiple schemes specific to various individual generic drugs." *Id.* This Court also held that Plaintiffs' factual allegations made plausible the "claim that Defendants' actions regarding the prices of individual generic drugs in their portfolios were beneficial to and reinforced a broader scheme regarding generic drug prices." *Id.* Finally, this Court held that Plaintiffs' "allegations of significant overlap among Defendants and the alleged individual drug conspiracies" were independently sufficient to allege an overarching conspiracy as a matter of law. *Id.*

59.    The U.S. Department of Justice continues to pursue a parallel criminal investigation of the generic drug industry's price-fixing practices.  Multiple Defendants have already admitted that they participated in price-fixing. The following table shows the status of the DOJ's charges.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| Date | Defendant | Status | Indictment/ Information<br>15 U.S.C. § 1 violations charged include these drugs | Co-conspirators<br>(if identified by DOJ) |
|---|---|---|---|---|
| 12/16/2016 | **Jason Malek**<br>**(Heritage)** | Pleaded Guilty | *Count 1*: Doxycycline hyclate<br>*Count 2*: Glyburide | |
| 12/16/2016 | **Jeffrey Glazer**<br>**(Heritage)** | Pleaded Guilty | *Count 1*: Doxycycline hyclate<br>*Count 2*: Glyburide | |
| 5/31/2019 | **Heritage** | DPA admits price fixing | *Count 1*: Glyburide | |
| 12/3/2019 | **Rising** | DPA admits price fixing | *Count 1*: Benazepril-HCTZ | |
| 2/4/2020 | **Ara Aprahamian**<br>**(Taro)** | Indicted | *Count 1*: Clotrimazole, Desonide, Fluocinonide, Lidocaine, Nystatin-Triamcinolone<br>*Count 2*: Carbamazepine, Clotrimazole, Etodolac IR and ER, Fluocinonide, Warfarin | *Count 1*: Sandoz<br><br>*Count 2*: Teva |
| 2/14/2020 | **Armando Kellum**<br>**(Sandoz)** | Pleaded Guilty | *Count 1*: Clobetasol | *Count 1*: Taro, Aprahamian |
| 3/2/2020 | **Sandoz** | DPA admits price fixing | *Count 1*: Clobetasol, Desonide, Nystatin-Triamcinolone<br>*Count 2*: Benazepril-HCTZ<br>*Count 3*: Desonide<br>*Count 4*: Tobramycin | *Count 1*: Taro<br>*Count 2*: Rising<br>*Count 3*: Perrigo<br>*Count 4*: Teva |
| 5/7/2020 | **Apotex** | DPA admits price fixing | *Count 1*: Pravastatin | *Count 1*: Teva |
| 7/23/2020 | **Taro** | DPA admits price fixing | *Count 1*: Clobetasol, Desonide, Nystatin-Triamcinolone<br>*Count 2*: Carbamazepine | Count 1: Sandoz, Kellum<br>Count 2: Teva |
| 7/14/2020 | **Glenmark** | Indicted | *Count 1*: Pravastatin<br>*Count 2*: Carbamazepine, Clotrimazole, Etodolac, Fluocinonide, Warfarin | *Count 1*: Teva, Apotex<br>*Count 2*: Taro, Aprahamian |
| 8/25/2020 | **Teva** | Indicted | *Count 1*: Pravastatin<br>*Count 2*: Carbamazepine, Clotrimazole, Etodolac, Fluocinonide, Warfarin<br>*Count 3*: Tobramycin, Etodolac, Nadolol, Temozolomide | *Count 1*: Glenmark, Apotex<br>*Count 2*: Taro<br>*Count 3*: Sandoz |

**FILED WITH REDACTIONS – PUBLIC VERSION**

60.     Plaintiffs have thus far filed nineteen open actions relating to the conspiracy: seventeen actions that focus on single drugs, an eighteenth multi-drug action alleging an overarching conspiracy as to a separate set of drugs, and a nineteenth multi-drug action alleging that additional drugs and defendants that were part of an overarching conspiracy.[9] This Complaint adds claims relating to over fifty additional generic drug products, and Plaintiffs again allege that subsidiary schemes were part of an overarching conspiracy based on the principles of fair share and are therefore legally cognizable as a single overarching conspiracy in which all Defendants participated (in the alternative, Plaintiffs allege that each of these drug-specific subsidiary schemes are actionable as individual conspiracies).

### 1.   The rules of the fair share conspiracy

61.     The foundational principle of the Defendants' fair share agreement is that each manufacturer is entitled to an equal slice of the market share pie of a given drug. Their basic formula is fair share $= \frac{1}{n}$ where $n$ is the number of "players" (i.e., manufacturers) in the market. In a "two-player" market, fair share is ½ or 50%; with three players it is ⅓ (33%); with four it is ¼ (25%). The Defendants sometimes discuss whether and how much leeway should be granted to a formerly exclusive manufacturer when a second manufacturer enters in the market, or when a

---

[9] This complaint is built mainly from documents found in the files of Defendants Sandoz, Taro, and G&W and is focused on topical dermatological drugs.  The first multi-drug "overarching" action, 18-cv-2533, was based on evidence from manufacturer Heritage. The second multi-drug action, 19-cv-6044, was based on evidence from manufacturer Teva and from certain drug distributors. Plaintiffs have been greatly aided by the States' diligent investigation, led by Connecticut, which is ongoing.

FILED WITH REDACTIONS – PUBLIC VERSION

third player enters a formerly two-player market. Defendant Taro created a graphic to show its idea of how seniority in order of entry might modify the fair share expectations:



62.      There are also several corollary principles that the participants in the conspiracy understand and agree with. First, and most important, competing beyond fair share is irresponsible, irrational, and greedy. Second, when seeking market share, new entrants or "under-indexed" competitors are supposed to take share from the player with the most share, although it is considered acceptable to take share from any player that has more than its fair share. Third, incumbent manufacturers are supposed to concede a handful of accounts to new entrants so that newcomers can get to fair share without aggressive prices and without risking a cascade of bids and counterbids that could rapidly erode prices. Fourth, no one should target the customers of a manufacturer who is below fair share unless they are willing to concede some other accounts to that manufacturer. Fifth, when any manufacturer increases prices, manufacturers who already have their fair share are not to use the opportunity to win additional share. Instead, when customers seek new bids in response to price increases, Defendants in each sub-agreement are supposed to refuse to bid ("walk away") or provide inflated cover bids ("bid high"). Sixth, if a

**FILED WITH REDACTIONS – PUBLIC VERSION**

competitor suffers only a temporary supply disruption, poaching its customers is considered unfair, but it is permissible to take more than fair share during a long-term supply problem.[10]

63.     Defendants frequently discuss and mostly adhere to these rules, but there are moments of betrayal and occasional bad blood.  On occasions when Defendants' employees are tempted to cheat the fair share rules, they are typically policed by superiors or by employees in closer contact with competitors, who remind them to play fair.

64.     Despite occasional grumblings about having to concede share, not a single one of the dozens of individuals who had knowledge of the fair share conspiracy ever took affirmative steps to withdraw from the conspiracy. Some did the opposite—they promised to keep quiet.

65.     Because the Defendants understood the basic tenets of fair share and knew that other Defendants agreed, they did not need to communicate each and every time they wanted to put the agreement into action.

66.     Some implementation actions did require more detailed discussions. For example, Defendants at times had differing information on the share represented by a certain customer or had information that was out of date. With so many products to track, the Defendants created fair share calculation spreadsheets but they sometimes entered the wrong numbers into their formulas or accidentally used data for a similarly named drug or a different formulation. These miscalculations and inconsistencies in perception of share status were a source of friction among the conspirators. Many of the glimpses of the conspiracy visible in this complaint occurred during these moments of friction when Defendants had to troubleshoot their conspiracy and get each

---

[10] As summarized by an employee of co-conspirator Camber Pharmaceuticals, "███████████ ████████████████████████████████████."

**FILED WITH REDACTIONS – PUBLIC VERSION**

other back on track towards fair share. When the fair share conspiracy was operating smoothly, fewer conversations were needed.

## 2. The logic of the fair share conspiracy

67.     Generic drugs are commodity products. In a typical competitive commodity market, a new manufacturer or one with little share must offer prices lower than the competition in order to win customers. Defendants realize this. "[I]f you look at generics, we're all the same product," testified Michael Perfetto, Defendant Actavis's VP of Sales and Marketing, in an unrelated case. By making room for new entrants and "under-indexed" manufacturers, the Defendants ensure that the newcomers will not attempt to win market share by offering lower prices, which Defendants call "trashing the market." The newcomers are therefore able to enter the market at artificially elevated prices, and, thereafter, all of the conspirators are able to raise their prices, customer by customer, with knowledge that their share is mostly safe from competition.

68.     Defendants' internal documents indicate that the market allocation and price increase aspects of the fair share scheme are linked because Defendants began to consider coordinated price increases once they had established a fair share balance with their competitors.

69.     It is important to note that generic drug manufacturers cannot always quickly follow a competitor's price increase. Various business reasons—including factory supply disruptions or contractual price protection terms with certain customers that could trigger penalties—could cause such delays. In those instances when a manufacturer's co-conspirators delayed in following a price increase, the underlying fair share understanding operated as a safety net to ensure that competitors would not take advantage of the increase to steal market share.

FILED WITH REDACTIONS – PUBLIC VERSION

70.     The overarching conspiracy works because, to manufacture a generic drug and sell it in the United States, a manufacturer must have a Food and Drug Administration approval known as an ANDA (Abbreviated New Drug Application). Completing an ANDA takes time, but because Defendants can buy, trade, or license already-approved ANDAs, and because many of the manufacturer Defendants do not make all the drugs they sell but instead subcontract to third-party factories (including to each other), they are always industry competitors of one another even if they are not product competitors at a certain moment. Prior to the fair share agreement, the observed tendency in generic drug markets was for prices to decrease rapidly with each new entrant, which is consistent with the standard equilibrium model of supply and demand.[11]

71.     From documents and interviews with former employees of Defendants, Plaintiffs have learned that many conspirators believe that, if price competition were to occur, each manufacturer would "naturally" end up with roughly its fair share, except at much lower prices (manufacturers would undercut one another until prices were close to cost). They believe fair share is a shortcut that arrives at the final "natural" balance of share by circumventing true competition and its concomitant negative pressure on prices. The shared goal is to short-circuit the market so that the same "natural" balance of share can be established at a higher price than would occur without collusion.

72.     The Defendants' continued and repeated adherence to the rules of fair share created an interdependent framework of trust that enabled and encouraged further anticompetitive activity. For example, customers in one generic drug market were sometimes traded for customers

---

[11] Generic drug markets with multiple competitors where Defendants are in the minority still do exhibit rapid price erosion when the Defendants are not successful in getting these other "irresponsible" manufacturers to play fair.

FILED WITH REDACTIONS – PUBLIC VERSION

in a different generic drug market. In other instances, competitors would support a price increase

for one drug with the understanding that their competitors would support a price increase for a

different drug. In the conspiratorial episodes discussed below, which comprise subsidiary

schemes within the overarching conspiracy, the reader will see discussions of fair share involving

multiple drugs at once.

73.    Arranging fair share is a longstanding practice among the Defendants. As early as

July 19, 2011, internal discussions at manufacturer Defendant Sandoz show the overarching

agreement in action. A Sandoz national account executive reported that a potential customer had

asked for pricing "▆▆▆▆▆▆▆▆▆▆▆" He asked his Sandoz superiors whether Sandoz

would "▆▆▆▆▆" given that ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

▆▆▆," another manufacturer Defendant. Sandoz's Vice President of National Accounts replied

simply "▆▆▆" Ten days later, Sandoz received yet another customer request due to Perrigo's

price increase. The superiors at Sandoz once again told him "▆▆▆▆▆▆▆▆" and told him

not to "▆▆▆▆▆▆▆" the Sandoz supply operations team whether Sandoz could supply the

customer. Around the same time, an email from the Vice President of National Accounts at a

Sandoz/Fougera predecessor company encapsulated the rules and logic of fair share:



**FILED WITH REDACTIONS – PUBLIC VERSION**

74.    The Defendants' own documents confirm that the fair share understanding has a
long history and is firmly entrenched in the minds of the conspirators. A management consultancy
hired by Sandoz to write a bird's-eye strategic report noted in December 2013 that Sandoz
employees were "████████████████" given "████████████" Specifically, the
consultants observed that Sandoz was reluctant to "████████████" or "████████

████" The report recommended that Sandoz set up an official process to discuss products and
make a "████████████████████████████" The report also mentioned in
its "████████████" that "████████████████
████████████████████████"

75.    Because all Defendants shared in the fair share understanding, similar overview
reports from other Defendants make the same points. When a junior employee at Defendant Taro
was introduced to the concept of fair share in 2013, his superiors explained: "████████

████████████████████████████████████████

████████████"

### 3. The terminology of the fair share conspiracy

76.    In their communications with one another, particularly in emails and texts, the
Defendants use seemingly innocuous terms of art that allow them to conceal and more efficiently
carry out the conspiracy. These terms are vague enough business jargon to allow a measure of
deniability, but have specific connotations understood by all those who participate in the fair

share agreement.[12] Several examples are worth mentioning, as they are used frequently and found in the communications cited as evidence in this complaint.

77.    A "**responsible**" competitor is one that avoids price erosion by refraining from bidding aggressively, seeks only its fair share, follows through with coordinated price increases, or generally abides by the fair share understanding. For example, Defendant Aprahamian advised the Taro Pricing Department in training documents from September and November 2013 that

"█████████████████████████████████████████████████████████████

████" In October 2013, Sandoz's Associate Director of Pricing used the term when he wrote internally that Sandoz had "decided not to pursue" one of Mylan's customers.



The term "**sandbox**" is used to refer to the generic drug industry as a whole and also deliberately alludes to the importance of "playing fair" with others in a certain space. "Mature" competitors act "responsibly" in the "sandbox."

78.    **"Rational"** and **"irrational"** have the same meaning as "responsible" when referring to the willingness of competitors to play fair. A rational competitor does not erode the market, seeks only its "fair share," and follows price increases. For example, in March 2014, after

---

[12] The drug industry has a separate, unrelated term of art called "fair share allocation" which refers to rationing of existing inventory during times of drug shortages based on previous purchases. This use of "fair share" or "on allocation," which applies only during shortages, cannot be confused with the conspiratorial fair share which involves divvying up markets by ceding accounts to competitors regardless of any shortage.

FILED WITH REDACTIONS – PUBLIC VERSION

Sandoz had established a balance with Taro and Hi-Tech in the market for Lidocaine ointment, a

Sandoz internal analysis cautioned the sales team:

████████████████████████████████████

████████████████████████

79.    **"Disrupting the market" and "rocking the boat."** Responsible/rational

competitors do not rock the boat; irresponsible/irrational competitors rock the boat by pursuing

too much share or taking other actions to "disrupt" the trust in a fairly shared market. Defendants

want to avoid being perceived as disruptive.  In the September and November 2013 training

documents from Defendant Aprahamian, he taught Taro employees "███████████████████

█████████████████"  Similarly, an internal email from Sandoz illustrates the term in

the context of fair share: "███████████████████████████████████████

██████████████."

80.    **"Under-indexed" and "Under-developed"** When manufacturers need other

manufacturer or distributor Defendants to know that they are under their fair share (and are

therefore entitled to more business), the term "under-indexed" may be used as a shorthand that

connotes both the concept of fair share and the manufacturers' current status. For example,

handwritten notes on an internal Sandoz business review presentation from May 2017—after the

state Attorneys General investigation was well underway—read: "████████████████████

███████████████████████████████████"

### 4. The scope and impact of the fair share conspiracy

81.     Throughout the course of the conspiracy, Defendants' executives called and texted one another thousands of times. The state Attorney General offices that have been investigating this conspiracy for over five years and are co-plaintiffs in this MDL have compiled phone records from mobile devices and landlines. Plaintiffs have collected a similar set of phone records. The graphic on the following page, created by the States, presents a portion of the communications and relationships between the Defendants and their competitors.

82.     Each line in the graphic represents at least one communication between the corporate Defendants' executives (identified by their initials) while they were competitors. Lines that terminate in the corporate Defendant's logo indicate a call traced to that corporate office but not to a specific individual. Many of these executives had hundreds of calls and texts with competitors. The volume of those communications is not captured by the graphic. As the graphic illustrates, there is no central hub or ringleader of the conspiracy – it is a distributed, redundant, interlocked network involving multiple individuals at each manufacturer.

**FILED WITH REDACTIONS – PUBLIC VERSION**



**FILED WITH REDACTIONS – PUBLIC VERSION**

83.      By 2012, the overarching fair share conspiracy had been established among the Defendants. Around this time the manufacturers began to focus more on coordinating large price increases than they had in the past. An analysis conducted by Defendant Sandoz showed that during the calendar years 2013 and 2014, there were 1,487 "large price increases" (increases of the Wholesale Acquisition Cost ("WAC") price greater than 100%). 178 of these products had a price increase of more than 1,000%.

84.      Similarly, a January 2014 survey of 1,000 members of the National Community Pharmacists Association, found that more than 75% of the pharmacists reported higher prices on more than 25 generic drugs, with the prices spiking by 600% to 2,000% in some cases. Indeed, more than $500 million of Medicaid drug reimbursement during the twelve months ending on June 30, 2014 was for generic drugs whose prices had increased by over 100%.

85.      The Defendants profited massively from their price-fixing activities. For example, in 2016, Taro's net income was 1,673% higher than in 2008. Taro's net sales revenue for 2016 reached nearly $1 billion, which was $600 million more than in 2008, before the start of the conspiracy. In SEC filings, Taro repeatedly stated that its increases in sales revenue and gross profit were "primarily due to price increases on select products" or "resulted from price increases." The graph on the following page shows how Taro steadily benefitted from the conspiracy's ability to inflate prices and prevent price erosion.

**FILED WITH REDACTIONS – PUBLIC VERSION**



86.    Perrigo's rewards for its illegal conduct were similarly massive. In its fiscal year 2015, Perrigo's prescription pharmaceuticals segment had net sales of over $1 billion. This was $800 million more than in 2008. These increases were due to generic drug price increases. Perrigo's non-prescription segments, which sell topical products such as sunscreen, saw net sales revenue increase by only 153% from 2008 to 2015. Over the same time period, the segment involved in the conspiracy saw a net sales revenue increase of 521%.

**5. Defendants actively concealed the conspiracy**

87.     Individuals at each of the Defendant manufacturers had different degrees of awareness of the unlawful nature of their anticompetitive conduct. Some were either oblivious or brazen. They spoke freely about the fair share understanding with competitors, and took frank notes. Others knew that they needed to conceal the fact that they had discussed price increases and market share targets with competitors and adopted several tactics to cover their digital tracks.

88.     First, they moved discussions off of email and spoke over the phone. For example, in May 2014, an employee at Taro saw a confidential internal spreadsheet with fair share calculations and sent the author an email asking " ██████████████████████ " Although the email was sent in the evening, Defendant Ara Aprahamian (Taro's Vice President of Sales and Marketing) wrote back within six minutes "████████████████████ ██████ ."

89.     Second, when reporting to their in-house teams about communications with competitors, Defendants often anonymized the true source of information by attributing it to an unnamed "customer."

90.     Third, confirmed facts were re-described as rumors, feelings, or predictions. For example, admitted Sandoz conspirator Armando Kellum once wrote that he "████████████ ████████████████ " when in fact he had discussed the upcoming price increase with the competitor and had no doubt that the activity in question was absolutely the result of a price increase.  There is also evidence that emails, presentations and spreadsheets that had already been circulated were later altered to avoid any reference to fair share or to the fact a manufacturer had firm knowledge of another manufacturer's future plans.

91.     Finally, as detailed in the following sections, when the manufacturers wanted to reject additional business in order to support a price increase or maintain a fair share balance, they often covered up the conspiracy by promulgating disinformation. They "blamed supply" for their professed inability to sell more product, when in fact the supply excuse was purely pretextual.

## B.    The Initial Collusive Relationships

92.     The key manufacturers of generic topical products—Fougera (and later Sandoz), Perrigo, Taro, and Actavis—had long-standing relationships from which they built a consensus to follow each other's price increases and to refrain from poaching each other's customers. These relationships were the kernels of the conspiracy and are detailed below.

### *CW-6 (Fougera), T.P. (Perrigo) & H.M. (Taro)*

93.     CW-6[13] was a senior sales executive at Fougera between October 2004 and August 2012 and a central player in the collusion taking place among generic topical manufacturers at that time. Prior to working at Fougera, CW-6 was a lead buyer in the generics group at Cardinal Health where he developed extensive contacts in the industry.

94.     Upon moving to Fougera, CW-6 was instructed by his supervisor, Defendant Walter Kaczmarek, a senior executive, to reach out to his contacts at competitor companies to discuss market allocation, price increases, and other commercially sensitive topics. If CW-6 did not have a contact at a competitor, Kaczmarek directed him to pass messages to that competitor through his contacts that did (this was a common practice among the conspirators).

---

[13] Witnesses who participated in the conspiracy and are now cooperating with the States in their investigation are identified in this complaint as "CW." Their identity is known to the Plaintiffs and their narratives are corroborated by documents in Plaintiffs' possession.

**FILED WITH REDACTIONS – PUBLIC VERSION**

95.     CW-6 regularly discussed competitively sensitive topics with his competitors at trade shows and customer conferences. CW-6 often reported conversations with competitors to Kaczmarek, and Fougera used that information to set its prices, schedule its price increases, and allocate customers between Fougera and its competitors.

96.     CW-6 had a particularly collusive relationship with T.P., a sales executive at Perrigo, dating back to at least 2010. CW-6 and T.P. were not social friends. If the two were communicating, the purpose was to collude. They had over 300 phone calls from 2010 to 2012. CW-6 and T.P. regularly met at trade shows and customer conferences and discussed competitively sensitive topics. The goal of these conversations was always to keep prices as high as possible.

97.     CW-6 also had a collusive relationship with H.M., a sales executive at Taro, dating back to at least 2011. CW-6 spoke with H.M. in person at trade shows and customer conferences as well as by phone. During these conversations, they coordinated customer allocation and price increases on products where Fougera and Taro overlapped.

98.     In instances when Fougera, Perrigo, and Taro all sold the same drug at the same time, CW-6 passed messages between Perrigo and Taro to ensure the anticompetitive agreement was understood by all three competitors. This was necessary because T.P. and H.M. did not have an independent relationship and depended on CW-6 to serve as a conduit.

99.     During the early days of the conspiracy from 2010 to 2012, T.P. and H.M. acted at all times at the direction of, or with approval from, their superiors, including Defendant Wesolowski of Perrigo and Defendant Blashinsky of Taro.

FILED WITH REDACTIONS – PUBLIC VERSION

*Michael Perfetto and M.D. (Actavis) relationships with Mitchell Blashinsky (Taro) and T.P. (Perrigo)*

100.    Defendant Michael Perfetto, then a senior sales and marketing executive at Actavis, had a collusive relationship with Defendant Mitchell Blashinsky, then a senior marketing executive at Taro. Between January 2011 and May 2012, when Blashinsky moved to Defendant Glenmark, the two of them exchanged at least 120 phone calls.

101.    Similarly, M.D., a sales executive at Actavis, had a collusive relationship with T.P. of Perrigo going back many years. The two discussed market allocation and coordinated price increases on products where Actavis and Perrigo overlapped. During this early time period, M.D. was acting at all times at the direction of, or with approval from, his superiors at Actavis, including Defendant Perfetto.

*CW-4 (Sandoz) & D.S. (Taro)*

102.    CW-4 worked as a senior sales executive at Sandoz for many years. At Sandoz, CW-4 was evaluated based on her ability to acquire information concerning product launches, customer alignment, price increases, and supply disruptions. She acquired this information from customers as well as from competitors with whom she had relationships, and she reported it to superiors at Sandoz, including senior pricing executives CW-1 and Defendant Armando Kellum. When CW-4 felt pressure from superiors to deliver useful information, she tended to engage in more anticompetitive conduct.

103.    CW-4 had a longstanding relationship with D.S., a sales executive at Taro. CW-4 first met D.S. when he was a buyer at a large grocery chain. The two developed a friendly relationship, in addition to a professional one.

**FILED WITH REDACTIONS – PUBLIC VERSION**

104.    In 2009, shortly after D.S. joined Taro, he and CW-4 met in person at an industry event and had a high-level discussion about Taro's and Sandoz's philosophies with respect to market share and pricing. The two competitors agreed that both of their employers believed in price increases and maintaining higher pricing. D.S. explained that companies that compete on price to get more market share were bad for the market because they brought prices down. CW-4 agreed and the two discussed the importance of maintaining a fair share balance, not being greedy about market share, and following price increases on overlapping products.

105.    After this conversation, CW-4 and D.S. were confident that they had a consistent understanding, and that neither Sandoz nor Taro would compete aggressively against the other.

106.    In addition to communicating frequently in-person, CW-4 and D.S. also spoke often by phone. Between January 2011 (the beginning date of the collected phone records) and October 2013 (when D.S. left Taro), the two exchanged at least seventy-three phone calls.

107.    During this early time period, CW-4 and D.S. acted at all times at the direction of, or with approval from, their superiors including Defendant Kellum of Sandoz and Defendant Blashinsky of Taro.

**FILED WITH REDACTIONS – PUBLIC VERSION**

C.    **Early Episodes in the Conspiracy: Sandoz/Fougera and Taro**

1.    **Triamcinolone Acetonide Cream and Ointment (Fougera, Perrigo)**

108.    Triamcinolone acetonide, also known by the brand names Aristocort, Aristocort HP, Kenalog, and Tridem, is a corticosteroid that is used to treat a variety of skin conditions, including eczema, dermatitis, allergies, and rashes. Triamcinolone acetonide is available as both a cream and an ointment.

109.    In July 2010, Fougera and Perrigo were the only manufacturers of the cream and ointment. Fougera increased its WAC prices on July 1 and July 20, 2010. Perrigo increased its WAC prices on July 21 and again on July 30, 2010. These price increases were preceded by calls from Fougera's CW-6 to T.P. at Perrigo. Both companies then adhered to their understanding that they would support each other's price increases by refusing to supply each other's customers.

110.    On July 30, 2010, when Fougera was offered an opportunity to sell to a Perrigo customer due to the Perrigo price increase, Defendant Walt Kaczmarek called his Fougera subordinate CW-6, who then dialed T.P. and confirmed the Fougera-Perrigo pact to allocate customers and maintain the price increases. CW-6 called Kaczmarek back, and Kaczmarek then instructed another Fougera subordinate (CW-3, a National Account Executive at the time) that he should not even bother asking the supply chain department whether Fougera could supply Triamcinolone cream and ointment, because Fougera would not be bidding and would not respond to the customer until the last minute. At the same time, T.P. called his boss, Defendant Wesolowski, and reported the successful price increase arrangement.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## 2.    Adapalene Cream (Fougera, Perrigo)

111.    Adapalene cream, also known by the brand name Differin, is a retinoid drug used to treat severe acne. Fougera was the first to sell the generic cream in July 2010 and Perrigo entered the market in October 2010.

112.    Throughout October 2010, Fougera's CW-6 and Perrigo's T.P. called each other multiple times and discussed how their two companies would allocate market share by having Fougera concede certain customers to Perrigo. According to the phone records, CW-6 reported these conversations back to Defendant Walt Kaczmarek, often calling him immediately after hanging up with T.P. Over at Perrigo, T.P. did the same. He called his boss, Defendant John Wesolowski, immediately after ending calls with CW-6.

113.    By October 26, 2010, CW-6 and T.P. had discussed the allocation thoroughly enough for CW-6 to write a list of customer accounts that Fougera would give to Perrigo. The customers were selected so that, in total, Perrigo would have at least 40% of the market. The list was given to others at Fougera, including Kaczmarek. Not coincidentally, Perrigo then focused on bidding these accounts.

114.    Fougera complied with the anticompetitive agreement and Fougera plainly informed at least one customer that it would "███████████████████████████████████████ ████████████████████████." By the end of October 2010 Fougera had declined to supply Adapalene cream to certain existing customers and thus ceded their business to Perrigo. "████████" wrote Kaczmarek, "████████████████████."

FILED WITH REDACTIONS – PUBLIC VERSION

### 3. Clotrimazole-Betamethasone Dipropionate Cream and Lotion (Actavis, Sandoz/Fougera, Taro)

115.    Clotrimazole-Betamethasone dipropionate ("CBD"), also known by the brand name Lotrisone, is a combination of Clotrimazole (an antifungal agent) and Betamethasone dipropionate (a corticosteroid). It is available as a cream ("CBD cream") or a lotion ("CBD lotion"). These products treat a variety of inflamed fungal skin infections. In 2013, annual sales of CBD cream and lotion in the United States exceeded $150 million.

116.    In early 2011, the competitors in the generic market for CBD cream were Fougera, Taro, and Actavis, and the competitors in the generic market for CBD lotion were Fougera and Taro.

117.    In February and March 2011, Actavis, Taro and Fougera executives coordinated a price increase for these products. Defendant Mike Perfetto (Actavis) had at least eight calls with Defendant Blashinsky (then at Taro). CW-6 (Fougera) had calls with H.M. (a Taro sales executive).

118.    On March 9, 2011, J.R., a senior Actavis pricing executive, circulated internally a proposed price increase plan for four products, including CBD cream, to take effect on March 28, 2011. Actavis planned to raise WAC prices for CBD cream by 227% and to increase contract prices to customers by as much as 1100%. That same day, internal emails at Fougera noted "███████████████████████" even though Actavis had not yet announced the increases publicly and would not do so until March 25, 2011. Fougera's internal emails also noted "██████████████████████," i.e., all products that include the Betamethasone molecule.

119.    By happenstance, just days before the announcement, Actavis learned that its active pharmaceutical ingredient ("API") costs for CBD cream would increase. Actavis used this

- 44 -

FILED WITH REDACTIONS – PUBLIC VERSION

fact to mislead its customers about the true reason for the price increase and provide cover for the conspiracy. The Actavis team was told to blame the API cost and "████████████" and Defendant Perfetto reminded them to blame the API cost and "███████."

120.    On March 30, 2011, Fougera announced price increases for CBD cream. The WAC price increased by 54% and contract prices increased across the board, in some cases by over 1200%. The next day, CW-6 (Fougera) and H.M. (Taro) spoke three times and by April 4, 2011, Taro had implemented CBD cream and lotion price increases that, for some customers, resulted in a 900% higher price.

121.    On April 14, 2011, Fougera supported Taro's price increases by raising its CBD lotion WAC by 71% and increasing contract prices to all customers.

122.    In furtherance of the conspiracy to raise prices, Fougera repeatedly refrained from taking on customers that approached it for bids.  For example, on April 20, 2011, Kaczmarek instructed a Fougera National Accounts Executive to tell at least one customer that Fougera could not supply the CBD cream (which was not true). His rationale was that selling to a competitor's current customer was "███████████████████████████████████."

123.    Approximately one year later, Taro and Fougera continued to discuss further coordination of price increases. The Taro team (including Blashinsky, H.M., and D.S.)  began yet another round of calls to Actavis and Fougera to convey their desire to raise prices and to secure commitments that Actavis and Fougera would help maintain the increases by refraining from taking Taro's customers.[14] Defendant Perfetto had multiple calls with Blashinsky

---

[14] Fougera had learned that "████████████████" had been asking others in the industry ""███████ ████████████████████████████████"

FILED WITH REDACTIONS – PUBLIC VERSION

throughout March 2012, as did Defendant Ara Aprahamian, who was at Actavis at the time but later went to work for Taro.

124.    Taro increased its prices for CBD cream on March 30, 2012 for most of its existing customers.

125.    Actavis stuck to the plan and refused to undercut Taro. On May 23, 2012, Actavis was offered such an opportunity but Defendant Perfetto told his team that they "██████████ ██████." A subordinate said she would inquire further with the customer and Perfetto reminded her "████████." "██████████████" remarked Defendant Aprahamian. The price the customer was willing to pay was actually on the high end for Actavis so the Actavis team was tempted to take the business. But, Perfetto called Blashinsky at Taro multiple times on May 24, 2012 and the next day Perfetto also discussed the opportunity with Aprahamian, who put an end to the discussion in a simple two-word email to the Actavis team: "██████."

126.    In the fall of 2012, a fourth competitor (Prasco) entered the CBD cream market. However, Taro and Sandoz (which had acquired Fougera in July 2012) were still the only two competitors in the CBD lotion market. In September and October 2012 Sandoz made repeated overtures to Taro to support a new price increase for the lotion. Sandoz's CW-3 had at least fourteen calls with H.M. at Taro, and Sandoz's CW-4 had at least five calls with D.S. at Taro.

127.    On October 18, 2012, Sandoz doubled its CBD lotion WAC price and increased its contract prices.  Taro did not attempt to poach any Sandoz customers and instead followed with its own WAC and contract price increases on February 12, 2013, after calls between the same Taro and Sandoz employees.

### 4.    Fluocinonide Solution (Actavis, Taro, Fougera)

128.    Fluocinonide solution, also known by the brand name Lidex, is a corticosteroid used to treat a variety of skin conditions, such as eczema, dermatitis, allergies, and rashes.

FILED WITH REDACTIONS – PUBLIC VERSION

Fluocinonide solution comes in 60ml bottles, made by Taro and Fougera, and 20ml bottles, made only by Taro.[15]

129.     Fougera planned for a re-launch and price increase to be supported by its fair share partner Taro. On May 10, 2011, Fougera raised its WAC pricing for Fluocinonide solution by 100%—from $12.5 to $25—with the change effective the following day. That evening, Fougera also sent out contract price-change notifications to existing customers. The average net sales price for those contracts jumped 800% from $2.50 to $20.

130.     Three days later, on May 13, 2011, CW-6 (Fougera) had calls with H.M. (Taro). One week after those calls, Taro joined Fougera in substantially increasing its prices for Fluocinonide solution. Taro increased the WAC price by 200% (20ml) and 400% (60ml). Taro also increased average net sales prices by 260% (20ml) and by over 500% (60ml).

131.     After the price increases, Taro and Fougera evenly split the market and by September 2011 they had 48% and 50% share, respectively.

132.     CW-6 (Fougera) and H.M. (Taro) coordinated yet another set of price increases in winter 2012. On January 25, 2012, they called each other several times and CW-6 reported these conversations to Defendant Walt Kaczmarek, who then wrote that Fougera had " ████████████ ██████████████████████ " The plan was to triple the WAC prices, which would result in an extra $10 million in gross profit for the remainder of 2012, so long as Taro played fair.

133.     On January 27, 2012, CW-6 discussed the coordinated price increase with H.M. Later that day, Kaczmarek submitted the price increase proposal to the Fougera pricing committee. They enthusiastically approved it.

---

[15] In April 2011, Teva also produced the 60ml bottles but was about to discontinue the product.

134.    Fougera raised its WAC and contract prices on Valentine's Day 2012 and CW-6 spoke with H.M. both the day before and the day after the increases. Within twenty-four hours of the increase, Defendant Blashinsky, informed by H.M.'s conversations with CW-6, told his Taro colleagues that prices had increased dramatically and that Taro would follow shortly.

135.    In furtherance of their price increase agreement, and consistent with the overarching conspiracy, Taro was careful not to use Fougera's price increase to poach customers and upset market share. Indeed, Taro refused to take on even relatively small customers such as Meijer and instead falsely claimed that it did not have inventory to supply Meijer. On February 26, 2012, Taro was offered an extra 5,400 units in annual sales but J.J., a Taro Vice President, told the account manager to reject the offer:



While these decisions were being made, Taro and Fougera employees remained in contact by phone.

### 5. Erythromycin Base / Ethyl Alcohol Solution (Fougera, Perrigo, Wockhardt)

136.    Erythromycin Base / Ethyl Alcohol Solution ("Erythromycin solution") is a topical medication used to treat acne.

137.    In the summer of 2011, Fougera and Wockhardt were the only two competitors in the market for Erythromycin solution, but they both had production difficulties and could not consistently supply the drug.

138.    Between May 17 and May 19, 2011, Perrigo discussed internally whether to re-enter the Erythromycin solution market. The next day, May 20, 2011, Perrigo's T.P. called CW-6 at Fougera and, immediately after that call, T.P. called his supervisor, Defendant John

Wesolowski. The following Monday, May 23, 2011, Wesolowski approved Perrigo's plans to re-launch the product within six months.

139.    On August 5, 2011, Fougera's CW-3 told his boss Walt Kaczmarek that he had heard that Wockhardt would be sold out of Erythromycin solution sometime at the end of the month. This caused Fougera's CW-6 to call M.C., who worked at Wockhardt.  The calls were the first between the two competitors according to the available phone records. CW-6 and M.C. were not friends and did not socialize together. They spoke only to coordinate anticompetitive conduct relating to products on which Fougera and Wockhardt overlapped.

140.    Over the next week in mid-August 2011, CW-6 exchanged several calls with M.C. of Wockhardt and T.P. of Perrigo, the prospective new entrant. Because T.P. and M.C. did not have an independent relationship, CW-6 acted as their go-between, relaying information. After speaking with his competitors, CW-6 called Kaczmarek to report what he had learned.

141.    Months later, Perrigo had set a December 2011 launch date for Erythromycin solution. On November 15, 2011, Wesolowski emailed the Perrigo team and asked them to find out Wockhardt's pricing. Two days later, T.P., one of the recipients of the email, called CW-6 at Fougera and, within minutes, CW-6 called M.C. at Wockhardt. CW-6 eventually learned from M.C. that Wockhardt planned to abandon the Erythromycin market the following year (2012) and would be out of the market for up to two years. CW-6 shared this information with T.P. at Perrigo.

142.    On December 19, 2011, Perrigo launched Erythromycin solution with WAC prices approximately 200% higher than the prevailing WAC prices at the time. CW-6 and T.P. had several calls around this time, including on the launch day itself.

**FILED WITH REDACTIONS – PUBLIC VERSION**

143.    At the end of April 2012, CW-6 and CW-3 of Fougera, Wesolowski of Perrigo, and M.C. of Wockhardt all attended a trade show for chain drugstores (the "NACDS" conference) in Palm Beach, Florida.

144.    On May 3, 2012, Fougera re-entered the market and Walt Kaczmarek told his team to get market share using a "███████████."[16] That same day, CW-3 of Fougera called K.K. at Wockhardt and also called A.F., a sales executive at Perrigo. Also that same day, CW-6 called his habitual co-conspirator T.P. at Perrigo. Once again, CW-6 reported the conversation to Kaczmarek immediately after hanging up with T.P.

145.    On May 7, 2012, based on the conversations between CW-6 and T.P., Wesolowski wrote an internal email to his Perrigo colleagues stating that Perrigo would need to give up at least 25 to 35% of the market to Fougera but that Fougera was aware of Perrigo's recent price increase and so its entry would not cause lower prices.

146.    From May 8 to May 14, 2011, CW-3 and CW-6 continued to exchange calls with their respective contacts at Perrigo. CW-6 continued to freshly report these conversations to Kaczmarek within minutes of their conclusion.

147.    Fougera did secure at least 12% market share using its "███████████" but recalled its Erythromycin products on June 7, 2012. Fougera was then acquired by Sandoz and CW-6 left the company, but before his departure he introduced CW-3 to T.P. at Perrigo. These two men then developed their own collusive relationship, detailed later in this complaint.

---

[16] Kaczmarek specified later that week that a "███████████" meant sending offer letters only to specific customers, because offering to supply more than a handful of customers was "█ ███████" to make the drug available at cheaper price. Fougera wanted to make the drug as expensive as possible.

FILED WITH REDACTIONS – PUBLIC VERSION

148.    Fougera, now operating as Sandoz, re-entered the Erythromycin market in September 2012.  A Sandoz senior pricing executive identified herein as CW-1 instructed CW-3 to prepare offers for Cardinal and Wal-Mart and advised that those would be the only two customers Sandoz would supply with Erythromycin.  CW-3 then had several calls with T.P. at Perrigo.  By October 2012, Perrigo had conceded both accounts to Sandoz.

**D.    Early Episodes in the Conspiracy: G&W**

149.    Although G&W is not a large company and does not manufacture as many topical products as some of the larger generic manufacturers discussed so far, G&W has actively conspired with its competitors for many years.  During the early days of the conspiracy, from 2009 to 2012, G&W had anticompetitive relationships with Fougera and Glenmark and used those relationships to allocate markets and fix prices on a number of products on which those companies overlapped.

150.    Defendant Jim Grauso, then a senior sales and marketing executive at G&W, had a relationship with CW-6 of Fougera.  Although Grauso and CW-6 were social friends, they also had an ongoing understanding, on behalf of the companies they represented, not to poach each other's customers and to follow each other's price increases.  Additionally, when CW-6 of Fougera needed to communicate with a competitor but lacked a contact, his supervisor Defendant Kaczmarek directed CW-6 to call and ask Grauso to convey messages to competitors on behalf of Fougera.

151.    During this early time period, Grauso acted at all times at the direction of, or with approval from, his superior Defendant Kurt Orlofski of G&W.

152.    Grauso left G&W in December 2011 to take a position as a senior executive at Aurobindo.  Because CW-6 no longer had a contact at G&W, it became necessary for him to use

**FILED WITH REDACTIONS – PUBLIC VERSION**

Grauso to convey messages to Grauso's former colleagues who remained at G&W (Defendants Orlofski and Erika Vogel-Baylor). Orlofski was the President of G&W and Vogel-Baylor was Vice President of Sales and Marketing (which was Grauso's former role).

153.    This worked well for the first few months of 2012. However, soon Orlofski believed it would be prudent to cut out the middleman and communicate directly with CW-6. David Berthold, the Vice President of Sales at Lupin, introduced Orlofski to CW-6 and they set up a dinner meeting at an industry conference that was also attended by Vogel-Baylor.

154.    At dinner, Fougera and G&W engaged in a high-level discussion to ensure that both companies would continue to "play nice in the sandbox" and minimize competition with each other even though Grauso had left. No specific products were discussed at the meeting. The theme was the need to stay on course and continue to coordinate customer allocation and price increases on products where G&W and Fougera overlapped.

155.    After the dinner, Vogel-Baylor began to communicate directly with CW-6. Between May 2012 and May 2013, when CW-6 left the industry, the two exchanged at least 133 phone calls and text messages.

156.    In addition to colluding with CW-6 at Fougera, Vogel-Baylor also had a collusive relationship during these early days with CW-5, a senior executive at Glenmark. They first met at a Rite Aid event in Las Vegas, Nevada in March 2012. In the months that followed, the two stayed in constant communication through emails, text messages, and phone calls, while also meeting in person at various trade shows and customer conferences.

157.    The following sections provide specific examples of how G&W's collusive relationships led to price-fixing of several drugs between 2010 and early 2012.

**FILED WITH REDACTIONS – PUBLIC VERSION**

### 6. Metronidazole 0.75% Cream and Lotion (Actavis, Fougera, G&W)

158.    Metronidazole 0.75% is a topical antibiotic that has been produced since the early 1960s.  In 2011, Actavis, Fougera, and G&W sold the cream formulation of Metronidazole. Actavis and Fougera also sold the lotion.

159.    On July 6 and July 7, 2011, Mike Perfetto, a senior sales and marketing executive at Actavis, spoke with Jim Grauso at G&W to coordinate a price increase for both the cream and the lotion.

160.    Actavis raised prices effective Friday, July 22, 2011. On Saturday morning, Fougera's CW-6 called Grauso to discuss the increase.

161.     By July 25, 2011, Fougera's Walt Kaczmarek wrote to his team that Fougera had identified an opportunity to raise pricing. Later that day CW-6 and Grauso had calls to confirm their agreement—which CW-6 quickly reported to Kaczmarek—and Fougera informed its customers that prices would increase overnight.

162.    From July 26 to July 28, 2011, Grauso had calls with Perfetto and with CW-6 to confirm that all three were on board with the price increases.  G&W's Kurt Orlofski also texted Perfetto.

163.    G&W raised prices on July 28, 2011. That same day, Kaczmarek instructed his Fougera sales team not to bid on G&W customers.

### 7. Calcipotriene Solution (Fougera, G&W)

164.    Calcipotriene solution, also known by the brand name Dovonex Scalp, is a form of vitamin D that impacts the growth of skin cells. This topical medication is prescribed for the treatment of chronic plaque psoriasis of the scalp. In fall 2011, G&W and Fougera controlled almost all of the Calcipotriene market.

FILED WITH REDACTIONS – PUBLIC VERSION

165.    From November 10 to November 17, 2011, Grauso and CW-6 had a series of calls to coordinate a price increase for Calcipotriene solution. The conversations went well because they had previously spoken about Calcipotriene in early June 2011, when G&W was about to enter the market.  The G&W increase went into effect on November 18, 2011.

166.    On November 21, 2011, to confirm the agreement to raise prices, CW-6 spoke with Kaczmarek, then called Grauso, and then called Kaczmarek back. Nearly simultaneously, on the G&W side, Grauso reported his conversation with CW-6 to his colleagues Orlofski and Vogel-Baylor. The Fougera increase went into effect on November 23, 2011.

### 8.    Fluocinolone Acetonide Cream and Lotion (Fougera, G&W)

167.    Fluocinolone acetonide is a steroid that reduces inflation. It is used for treating eczema and psoriasis and is available as both a cream and lotion.

168.    Fougera was the sole supplier of the drug until G&W entered the market on December 13, 2011. Within twenty-four hours, Fougera's Walt Kaczmarek called his subordinate CW-6 who then immediately called Jim Grauso at G&W. Due to earlier conversations between CW-6 and Grauso in October and November 2011, Fougera had planned to announce a price increase. Increasing prices is not normally a reasonable reaction to competition, but Grauso's conversations with CW-6 assured Fougera that G&W would follow the increase, despite having debuted the product at a lower price.

169.    From December 15 to December 21, 2011, CW-6 and Grauso had six more calls.

170.    On December 22, 2011, Fougera raised WAC prices of Fluocinolone cream and ointment by 200%.  Fougera knew from its discussions with G&W that G&W would follow the price increase.

**FILED WITH REDACTIONS – PUBLIC VERSION**

171.     Because G&W followed through with the agreement by raising its own prices on January 3, 2012, Fougera deliberately overbid its customers in order to give G&W market share at a high price. Defendant Kaczmarek recommended giving G&W up to 35% of the market in exchange for G&W having been smart about its entry.

172.     The coordination between Fougera and G&W continued into February 2012, although Grauso left G&W for Aurobindo and so CW-6 had to coordinate with Orlofski instead. Orlofski also spoke directly with Kaczmarek at Fougera to allocate share to G&W.

### 9.    Metronidazole 0.75% Gel (G&W, Fougera, Sandoz, Taro)

173.     Beginning in July 2011, Sandoz, Fougera, Taro and G&W coordinated price increases for the 0.75% gel formulation of Metronidazole, a topical antibiotic.

174.     On July 6, 2011, CW-4, a senior sales executive at Sandoz, had three calls with D.S. at Taro. CW-4 was told that Taro would be raising prices on Metro gel .75%. Based on their prior conversations and understanding, CW-4 knew that Sandoz was expected to follow the price increase. CW-4 then wrote an email to a Sandoz product manager in which she communicated that an increase was expected.

175.     On February 1, 2012, CW-6 and Kaczmarek (Fougera), CW-4 (Sandoz), D.S. (Taro) and Vogel-Baylor and Orlofski (G&W) all attended a generic pharmaceuticals conference in Atlanta.

176.     On February 2, 2012, G&W created a proposal to more than triple the price of Metronidazole 0.75% gel. Vogel-Baylor used her former colleague Jim Grauso (who had moved to Aurobindo) to convey information to Fougera's CW-6 regarding the increase. In the span of an hour Grauso had conversations with Vogel Baylor, and then CW-6, and then Vogel-Baylor again, and then CW-6 again, and then Vogel-Baylor's G&W boss Kurt Orlofski.

FILED WITH REDACTIONS – PUBLIC VERSION

177.    On February 8, 2012, Orlofski received an updated price increase analysis, and then spoke directly with Fougera's Walt Kaczmarek (CW-6's supervisor).

178.    On February 14, 15 and 17, 2012, Grauso continued to make calls back and forth between CW-6 and Vogel-Baylor so that Fougera and G&W could discuss the planned price increase without calling one another directly.

179.    On February 17, 2012, G&W sent out letters notifying its customers of the Metro Gel .75% price increase.

180.    From February 22 to February 24, 2012, senior executives from all four companies met at a conference in Orlando. During the conference, they individually discussed the details of the Metronidazole gel 0.75% increase.

181.    On March 9, 2012, Sandoz's Armando Kellum instructed his team to make "█ ███████████████" in order to support the G&W increase. "███████████████," he suggested.

182.    Within the next several weeks, all three competitors followed G&W's increase on Metro Gel .75% as agreed and essentially matched G&W's WAC pricing. Fougera increased on March 16, 2012, Taro increased on March 23, 2012, and Sandoz increased on April 6, 2012.

### 10.  Ciclopirox Cream (Glenmark, G&W, Perrigo)

183.    Ciclopirox cream, known by the brand name Loprox, is an antifungal medication. In early 2012, G&W was preparing to enter the market and join Perrigo and Fougera.

184.    On February 20, 2012, G&W's Kurt Orlofski wrote that G&W needed to secure 20% market share upon launch. The next day, he exchanged texts with S.K., a high-level executive at Perrigo.

FILED WITH REDACTIONS – PUBLIC VERSION

185.    By March 2012, G&W was prepared to use one of its customers (Publix) as a messenger to tell Glenmark that G&W would not compete for further business if it were able to win two specific accounts from Glenmark.

186.    By April 2012, G&W's Erika Vogel-Baylor had developed a relationship with a senior executive at Glenmark known in this complaint as CW-5. The two first met at an industry conference in Las Vegas, Nevada and met again a month later in Palm Beach, Florida. During these meetings, and on calls, they arrange market allocation and a price increase for Ciclopirox.

187.    On April 18, 2012, while exchanging texts and calls with CW-5, Vogel-Baylor suggested increased prices for Ciclopirox cream. That same day, Glenmark began notifying its customers of its own price increase.

188.    Vogel-Baylor used her connections to allocate share after the price increases. On one occasion in May 2012 where G&W and Perrigo had both submitted bids to the same customer, Vogel-Baylor called CW-6 at Fougera, who then immediately called T.P. at Perrigo, spoke to him, and called Vogel-Baylor back. Ultimately, G&W retained one account and Perrigo retained the other.

E.    **The Evolution of Collusive Relationships**

189.    At the end of 2012 and beginning of 2013, the conspirators took advantage of personnel changes in the industry.  In July 2012, Sandoz completed its acquisition of Fougera. Many Fougera executives lost their jobs but CW-3 was retained to work at Sandoz. CW-3 became responsible for recommending where Sandoz could increase its prices. Because Sandoz manufactured and sold a large number of generic drugs, many competitors reached out to CW-3 to collude on overlapping products.

**FILED WITH REDACTIONS – PUBLIC VERSION**

190.    Later, three key Actavis executives—Defendants Doug Boothe, Mike Perfetto, and Ara Aprahamian—left to assume new leadership roles at two competitors. Doug Boothe became the Executive Vice President of Perrigo in December 2012. Mike Perfetto took over as Taro's Chief Commercial Officer in January 2013. Ara Aprahamian followed him a month later, becoming Taro's Vice President of Sales and Marketing. Their relationships are described in more detail below.

### CW-3 (Sandoz) & Aprahamian

191.    Around the time of the Fougera-Sandoz transition, CW-3 was approached by Aprahamian. CW-3 and Aprahamian had known each other since 2006, when CW-3 worked at drug distributor Cardinal and Aprahamian worked at distributor AmerisourceBergen, but they had lost touch. Once CW-3 became a Sandoz employee, he and Aprahamian started talking regularly again. CW-3 and Aprahamian almost always communicated by phone and rarely met in person.

192.    While Aprahamian was at Actavis, he and CW-3 engaged in anticompetitive conduct with regard to several Actavis-Sandoz overlap products. When Aprahamian moved to Taro as VP of Sales and Marketing, he was given the power to set prices. When he told CW-3 that Taro would give up a customer, CW-3 was confident, given Aprahamian's senior role, that Sandoz could rely on that representation.

193.    Over the years, Sandoz and Taro, primarily through CW-3 and Aprahamian, developed an ongoing understanding not to poach each other's customers and to follow each other's price increases. Indeed, every time that Taro increased prices on a product for which Sandoz was a competitor, Aprahamian informed CW-3 about the increases in advance and provided him with specific price points. CW-3 would write this information down and then pass the information along to his superiors CW-1 and Armando Kellum. The expectation was always

**FILED WITH REDACTIONS – PUBLIC VERSION**

that Sandoz would follow the increases, and Sandoz did. When there were other competitors in the market beyond Taro and Sandoz, CW-3 understood that Aprahamian was also coordinating with those competitors just as he was coordinating with him.

### CW-4 (Sandoz) & D.S. (Taro)

194.    As discussed above, since at least 2009, CW-4 of Sandoz and D.S. of Taro had an ongoing understanding that Taro and Sandoz would be "responsible" in the market and would not compete on overlapping products. However, after Sandoz acquired Fougera and its large catalog of topical products, CW-4 was unsure of how Taro would behave. She reached out to D.S. at Taro and they had several conversations, both in person and over the phone, during which they discussed which manufacturers of topical products could be trusted to behave responsibly. From their conversations, CW-4 understood that Taro wanted to maintain fair share and to keep prices high. Both CW-4 and D.S. reaffirmed their belief that this was the smart way to do business.

195.    During this time, CW-4 and D.S. were acting at the direction of, or with approval from, their superiors, including Kellum at Sandoz and Perfetto and Aprahamian at Taro.

### CW-3 (Sandoz) & T.P. (Perrigo)

196.    CW-3 was introduced to Perrigo's T.P. by CW-6 shortly after the Sandoz-Fougera transition. CW-3 and T.P. generally spoke only by phone and were not social friends. The purpose of their calls was to coordinate anticompetitive conduct with regards to Sandoz-Perrigo overlap products. They did not send texts or emails because T.P. did not want to leave any evidence of their communications.  On one occasion, T.P. admonished CW-3 for having left him a voicemail and demanded that CW-3 call only his personal cell phone and never his Perrigo office phone.  CW-3 reaffirmed the ongoing understanding that his Sandoz/Fougera predecessor,

CW-6, had established with T.P. and Perrigo: the competitors agreed not to take each other's customers and to follow each other's price increases.

197.    CW-3 and T.P. provided each other with information about price increases with the understanding that the other company would not use the price increase as an opportunity to compete for market share. When Sandoz launched into a Perrigo market, T.P. provided CW-3 with a list of customers to target.

### *Perfetto (Actavis) & Boothe (Perrigo)*

198.    Prior to Sandoz's acquisition of Fougera, H.M. of Taro and T.P. of Perrigo used CW-6 as a conduit to collude on overlapping products because the two competitors did not have an independent relationship. That changed when former Actavis executives Mike Perfetto and Doug Boothe moved to Taro and Perrigo, respectively. As a result of these moves, the two competitors could now communicate directly to coordinate their anticompetitive conduct with their former colleagues.

### F.    Sandoz Management Encouraged Collusion with Competitors

199.    Soon after the Fougera acquisition, CW-3 had a conversation with his Sandoz boss Armando Kellum and informed him that he could provide competitive intelligence on the Fougera product line. Shortly thereafter, CW-3 began providing Sandoz senior pricing executives Kellum and CW-1 with competitive intelligence he obtained from competitors regarding price increases, product launches, and customer allocation. Kellum and CW-1 both knew that CW-3 obtained this information directly from competitors because he told them he did.

200.    When communicating by e-mail, CW-3 disguised the true source of his information by stating that he had received it from "a customer." When CW-3 had truly learned

the information from a customer, it was always from a customer that he worked with, and he referred to that customer by name. CW-1 and Kellum understood that when CW-3 referred to hearing from a "customer" without identifying that customer—or if CW-3 attributed information to customers that he did not have responsibility for—it meant that CW-3 had learned that information from a competitor.

201.    CW-3's strongest relationships were with Aprahamian of Taro and T.P. of Perrigo. Due to the strength of CW-3's relationship with Aprahamian, Sandoz management created what it referred to as the " ▮▮▮▮▮▮▮ " in July 2013 to collude on products where Taro was a competitor. The " ▮▮▮▮▮▮ " had a two-pronged approach: (1) implement coordinated price increases on products where Sandoz and Taro were the only competitors in the market; and (2) exit the market for certain other products to allow Taro to raise prices. Sandoz could then re-enter the market later, at the higher price.

202.    Although Defendant Kellum and CW-1 knew what they were doing was illegal, they continued to encourage and approve of the collusion with competitors. They did, however, seek to avoid documenting their illegal behavior. Kellum routinely admonished Sandoz employees for putting information that was too blatantly anticompetitive into e-mails. At one point, Kellum told CW-1 " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ ." As the conspiracy continued to expand, CW-3 became increasingly anxious about his behavior and said to CW-1 " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." CW-1 agreed, but, as described below, they both continued to act in furtherance of the conspiracy.

### 11. Desonide Lotion (Actavis, Fougera)

203.    Desonide is a topical steroid that was developed in the 1970s and treats a wide variety of skin conditions. It is produced in various formulations, including a lotion.

- 61 -

204. Actavis and Fougera consistently collaborated to increase the price of Desonide lotion when they were the only manufacturers of the product. In summer 2009 they both increased WAC prices of Desonide lotion by 90%.

205. On July 22, 2011, Actavis once again increased prices—this time by 200%—and Fougera did the same three days later. After the price increases, consistent with fair share principles, Sandoz and Fougera declined opportunities to supply each other's customers in order to make the price increase "█████."

206. By August 2012, Actavis had 44% of the market share and Fougera (now as Sandoz) had 56%. At an NACDS conference at the end of that month, Actavis's Ara Aprahamian approached Sandoz's CW-3 and told him that Actavis would soon exit the market for a period of time. This was good news to CW-3 and his Sandoz boss Armando Kellum, who had recently been eyeing yet another price increase.

207. In September 2012, Kellum wrote that the rationale for his proposed Desonide lotion price increase was that he and his team believed Actavis would follow along with a price increase.

208. In October 2012, Kellum asked CW-3 to speak with Aprahamian to find out Actavis's plans for Desonide lotion. CW-3 had several calls with Aprahamian and reported back to Kellum and others, but cloaked his source by attributing the information to a "customer I spoke with." CW-3 knew that Kellum would understand that the attribution to a nameless "customer" meant the true source was a direct communication with Sandoz's competitor.

209. In November 2012, Sandoz created an internal analysis predicated on the expectation that it would not lose any business—despite increasing its prices—because Actavis would continue to respect price increases and not poach customers.

FILED WITH REDACTIONS – PUBLIC VERSION

210. On December 5, 2012 Sandoz implemented a 75% price increase and CW-3 called Aprahamian to give him the details of the increase. Sandoz and Actavis understood that once Actavis was able to fix its manufacturing deficiencies and was authorized to re-enter the market, it would match Sandoz's elevated prices.

211. Actavis re-entered the market on August 22, 2013. CW-1 joked that Sandoz should reduce its Desonide prices by 75% (he knew no such competition was necessary). Instead, Sandoz planned to "███████████████████████████████" because Sandoz knew that Actavis would be "███████" and would "███████████." Sandoz proceeded to concede several of its Desonide lotion customers to Actavis in order to allow Actavis to regain its market share "████████████████."

### 12. Ciclopirox Shampoo (Actavis, Perrigo, Sandoz, Taro)

212. Ciclopirox shampoo, also known by the brand name Loprox, is used to treat seborrheic dermatitis, an inflammatory condition of the scalp. In summer 2012 the three competitors in the market were Perrigo, Actavis, and Taro, but Sandoz was considering entering the market because it had recently acquired the rights via its absorption of Fougera.

213. In early September 2012, CW-3 was asked by two of his Sandoz superiors to collect information on Ciclopirox shampoo pricing. The next day, CW-3 called his contacts at Taro and Perrigo, H.M. and T.P., and then reported to his two Sandoz superiors that he had discussed pricing with both competitors. Following these calls, Sandoz approved the plan to launch Ciclopirox shampoo.

214. On November 26, 2012, in accordance with the principles of fair share, CW-3 was asked to determine which customers to target in order to take share from Actavis and Perrigo, who held the majority of the market. The next day, CW-3 called Ara Aprahamian (then at Actavis) to coordinate the customer allocation, and they spoke twice again on November 28.

FILED WITH REDACTIONS – PUBLIC VERSION

CW-3 told his Sandoz superiors CW-1 and J.R. what he had learned from his calls with competitors. He did so over the phone—despite having been asked for an update via email—because he did not want to put anything in writing.

215.    On November 30, 2012, CW-3 also called T.P. at Perrigo to specify the customers that Sandoz would target in order to obtain fair share.

216.    Sandoz officially launched the product on December 3, 2012 and CW-3 called Aprahamian at Actavis on December 4 and 5, 2012.   Later on December 5, M.D. at Actavis called T.P. at Perrigo to confirm their understanding regarding Sandoz's entry.  Within three days of Sandoz's entry, Actavis and Perrigo ceded to Sandoz customers that CW-3 had discussed in his calls with competitors.


**G.**    **Taro's Coordination of May 2013 Price Increases**

217.    By early spring 2013, Ara Aprahamian and Michael Perfetto had joined Taro and were in charge of Taro's pricing decisions. Buoyed by their success in allocating market share with competitors back at Actavis, the two men set out to coordinate price increases with competitors where they had established trusted collusive relationships.

218.    Ultimately, in May 2013, Taro increased the prices of twelve products[17] in order to collect an anticipated $110 million in additional revenue. Before implementing the price hikes,

---

[17] The twelve products are (1) Alclometasone dipropionate topical cream, (2) Ammonium lactate topical cream and (3) lotion, (4) Betamethasone dipropionate (augmented) topical lotion and (5) cream, (6) Betamethasone valerate topical cream, (7) Carbamazepine extended release tablets and (8) suspension, (9) Clomipramine capsules, (10) Desonide cream and (11) ointment, and (12) Terconazole vaginal cream. Several of these drugs are the subject of Plaintiffs' earlier complaints and Plaintiffs do not seek relief relating to those products via this complaint. In this complaint, Plaintiffs seek relief only for Alclometasone, Ammonium lactate, Carbamazepine suspension, and Terconazole.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Perfetto and Aprahamian coordinated with Taro's competitors Sandoz, Perrigo, Actavis, Mylan, and Glenmark.

219.    On April 2, 2013, Aprahamian spoke with CW-3 (Sandoz) over the phone to describe the price increases that Taro was planning for May 2013, as confirmed by CW-3's contemporaneous notes regarding overlap products:



220.    Immediately after hanging up with Aprahamian, CW-3 called T.P. at Perrigo to discuss the upcoming Taro price increases. T.P. told CW-3 that he already knew about them. When CW-3 hung up with T.P., he immediately called Aprahamian back. A few minutes after that call, CW-3 called his boss at Sandoz, Armando Kellum, to report on the planned price increases. Later that morning, Aprahamian spoke again with CW-3.

221.    At the same time, Taro also reached out to Glenmark by phone to discuss a proposed price increase for Alclometasone dipropionate cream. On both April 2 and April 9, 2013, a Taro employee—likely Mike Perfetto—called Glenmark's Mitchell Blashinsky from a Taro office.  Also on April 9, 2013, Taro had calls with Sandoz, the other manufacturer of the Alclometasone cream.   Follow-up calls between Taro and Sandoz and between Glenmark and Sandoz occurred on April 15 and 16, 2013. During these calls the three competitors discussed the planned price increase for Alclometasone cream and CW-3 took contemporaneous notes.

222.    Taro also reached out to its competitors Actavis and Perrigo to discuss a price increase for Ammonium lactate cream and lotion. On April 5, 9, 11 and 15, 2013, Taro's Perfetto

FILED WITH REDACTIONS – PUBLIC VERSION

and Aprahamian had calls with M.D. at Actavis and with T.P. and their former colleague Doug

Boothe at Perrigo. Actavis and Perrigo closed the loop with a lengthy call between M.D. and

T.P. on April 12, 2013.

223.    Throughout April 2013, CW-3 promptly informed his Sandoz boss Armando

Kellum about his contacts with competitors.

224.    By April 17, 2013, Taro's Aprahamian and Perfetto had finalized the list of

products for the coordinated price increases.

225.    From April 20-23, 2013, representatives from Taro, Sandoz, Perrigo, and

Glenmark attended an NACDS conference in Palm Beach, Florida. The attendees included

Aprahamian, Perfetto, Blashinsky, and a senior executive at Actavis named A.B.

226.    On April 29 and 30, 2013, Taro sent price increase notices to its customers.

Aprahamian and Perfetto continued to make calls to competitors in order to smoothly implement

the coordinated price increase. For example, Aprahamian called CW-3 on April 30 to tell him

about the price increases and the competitors that would support the increases. CW-3 took notes

and listed these competitors by initial, for example "T,M,S" for Taro, Mylan, and Sandoz.



FILED WITH REDACTIONS – PUBLIC VERSION

227.     Consistent with their ongoing understandings, Taro's competitors uniformly declined opportunities to bid on Taro's customers after the May 2013 increases. Taro's competitors understood that to do so would violate the rules of the conspiracy and would disrupt the market-share balance that they had established. The conspirators had developed a web of trust, and began working on implementing price increases of their own.

228.     For example, on April 30, 2013, Sandoz planned to lie about a supply shortage in order to support the price increases. A current Taro customer had asked Sandoz to provide three of the recently increased drugs: (Betamethasone Dipropionate Lotion, Clomipramine, and Carbamazepine ER). Internally, Sandoz's Kellum wrote to CW-4 that he was inclined not to do anything because Sandoz had an opportunity to raise prices together with Taro. Kellum did not see it as an opportunity to win more business for Sandoz by supplying the current Taro customer. Instead, he suggested that Sandoz could blame supply reasons as a pretext for declining new business.

229.     Two days later, following the same pattern, Actavis told the same customer that it could not take on further business for another one of the increase products (Terconazole cream).

230.     Over the next several months, each of Taro's competitors—Sandoz, Mylan, Perrigo, Actavis and Glenmark—followed with price increases of their own, as detailed below.

FILED WITH REDACTIONS – PUBLIC VERSION

| | | | |
|---|---|---|---|
| Alclometasone Diproprionate Cream | Sandoz | Followed | 5/10/13 |
| | Glenmark | Followed | 5/16/13 |
| Ammonium Lactate Cream | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Ammonium Lactate Lotion | Actavis | Followed | 6/25/13 |
| | Perrigo | Followed | 7/30/13 |
| Betamethasone Diprorionate Lotion | Sandoz | Followed | 7/26/13 |
| Betamethasone Diprorionate Cream | Sandoz | Followed | 7/26/13 |
| Betamethasone Valerate Cream | Sandoz | Followed | 7/26/13 |
| Carbamazepine Extended Release Tablets | Sandoz | Followed | 5/10/13 |
| Clomipramine Hydrochloride Capsules | Mylan | Followed | 5/16/13 |
| | Sandoz | Followed | 7/22/13 |
| Desonide Cream | Perrigo | Followed | 5/21/13 |
| | Actavis | Re-entered and Matched | 8/15/13 |
| Desonide Ointment | Perrigo | Followed | 5/21/13 |
| | Sandoz | Re-entered and Matched | 1/17/14 |
| Terconazole Cream | Actavis | Followed | 6/5/2013 |

231.     Consistent with past practice, the competitors often spoke by phone around the time of a matching price increase. For example, on July 23, 2013, Sandoz's CW-3 called Aprahamian to convey Sandoz's price increases for the Sandoz-Taro overlap products.

232.     Acting reciprocally, Taro declined to take market share from the competitors that had joined the price increases.

### H.     More Collusive Episodes Involving Taro

#### 13.   Alclometasone Dipropionate ointment (Taro, Sandoz, Glenmark)

233.     Alclometasone Dipropionate Ointment ("Alclometasone Ointment"), also known by the brand name Aclovate, is a topical steroid used to treat inflammation and itching caused by skin conditions such as allergic reactions, eczema, and psoriasis. The cream form of the drug is discussed above.

234.     From April to June 2013, Sandoz, the sole supplier of the ointment form, plotted with Glenmark and Taro to allow them both to re-enter the ointment market at higher prices. On

- 68 -

FILED WITH REDACTIONS – PUBLIC VERSION

April 15 and April 16, 2013, CW-3 of Sandoz had several calls with Ara Aprahamian at Taro and Mitch Blashinsky at Glenmark. On these calls, Blashinsky relayed that Glenmark would soon re-enter the Alclometasone Ointment market and would want 25-30 percent share. CW-3 took notes during these conversations.

235.    On May 30, 2013, Taro's Aprahamian and D.S. internally discussed what they called "███████████████████████." The next day, D.S. spoke with Blashinsky at Glenmark to coordinate the plan to increase prices upon re-entry.

236.    On June 6, 2013, Aprahamian wrote in an email that he would "██████████ ██████████████." The next day, he called CW-3 at Sandoz to do so.

237.    On June 10, 2013, Glenmark entered with WAC prices significantly higher than Sandoz's. The next day, Taro announced to the three major wholesalers—ABC, McKesson, and Cardinal—that it too was re-entering that market and matching Glenmark's elevated prices. The WAC prices were raised 201% to 239% higher. Sandoz learned of these increases and called them "██████████."

### 14.  Fluocinonide solution (Actavis, Sandoz, Taro)

238.    As detailed above, Taro and Fougera (now Sandoz) colluded to increase prices on Fluocinonide solution twice – once in May 2011 and again in February 2012.

239.    In June 2013, Actavis planned to enter the market and began coordinating with Taro and Sandoz to arrange a market allocation. Beginning on June 17, 2013, several Actavis employees, including Rick Rogerson, had calls with Taro employees, including their former colleagues Ara Aprahamian and Mike Perfetto. Interspersed with these calls, Aprahamian spoke with CW-3 to pass messages between Actavis and Sandoz because CW-3 did not have a direct line to a co-conspirator at Actavis. CW-3 took notes during these calls.

FILED WITH REDACTIONS – PUBLIC VERSION

240.    In accordance with their agreement, Taro concluded that "we will need to give up some market share" and, after discussions between Aprahamian and at least three Actavis sales executives, Taro ceded a large customer (ABC) to Actavis on July 12, 2013.

241.    As per the rules of fair share, Actavis next sought a large customer from Sandoz. Actavis refrained from bidding on other Taro and Sandoz customers. Sandoz ultimately ceded a large customer (Walgreens) to Actavis. During this time, Sandoz was also careful not to poach Taro's customers. When approached by a Taro customer on July 15, 2013, Sandoz cited supply constraints as a pretext.

### 15. Triamcinolone Acetonide paste (Rising, Taro)

242.    Triamcinolone acetonide paste, also known by the brand name Oralone, provides temporary relief from pain symptoms caused by mouth lesions. In October 2013, Rising and Taro were the two competitors in the market with roughly equal 50% shares.

243.    That autumn, CW-2, who was by then a senior sales and marketing executive at Rising, spoke to D.S. at Taro to discuss a price increase. These calls took place on September 27 and 30 and October 11 and 14, 2013.

244.    On October 16, 2013, Rising increased its WAC pricing for the product by 25%. Taro matched that WAC price two weeks later.

245.    Prior to implementing the increase, Ara Aprahamian of Taro wrote in an internal e-mail that Taro was " ██████ " its prices " ████████████████ " and noted that the risk of losing business was " ███ ." Indeed, the risk was " ███ " because CW-2 and D.S. had discussed the price increase in advance and Taro had confidence that Rising would respect its market position and not poach its customers.

### 16. Phenytoin Sodium ER capsules (Amneal, Mylan, Taro, Sun)

246. Phenytoin sodium, also known by the brand name Dilantin, is an antiepileptic drug that is used to prevent and treat seizures. In spring 2014, the extended release capsule formulation of the drug was sold by Amneal, Mylan, Taro, and Taro's parent company, Sun.

247. On April 7, 2014, Taro added Phenytoin to its proposed price increase list.

248. On April 10, 2014, Taro's Ara Aprahamian had two calls with M.A. at Mylan. The two would not speak again by phone until June 4, 2014, which would turn out to be the day after Taro ultimately raised prices of Phenytoin.

249. From April 26-29, 2014, representatives from Amneal, Mylan, Taro and Sun gathered at an NACDS meeting in Scottsdale, Arizona. In attendance were Ara Aprahamian and Mike Perfetto from Taro, Jim Nesta from Mylan, a pricing executive from Amneal named S.R., and a senior executive from Sun named G.S. During this meeting, Nesta and S.R. exchanged at least twenty-two texts and calls and Aprahamian asked his office to send him all of Taro's price details regarding Phenytoin.

250. On May 27, 2014, S.R. from Amneal spoke with Mylan's Jim Nesta.

251. On May 29, 2014, S.R. again spoke and texted with Mylan (this time, with M.A.). That same day, Mylan's Pricing and Contracts team wrote a report that marked Phenytoin as a "potential Amneal price increase" product, even though no generic manufacturer had increased its prices yet.

252. On June 3, 2014, Taro increased its WAC prices. Aprahamian, S.R., M.A. and Nesta called one another in the following days.

253. An internal report from Sun written on July 2, 2014, noted that Amneal had increased prices on Phenytoin, even though Amneal's increase was not to occur until several months later.

**FILED WITH REDACTIONS – PUBLIC VERSION**

254.    Taro maintained the price increases with the knowledge that the other manufacturers would not use the moment to take market share. Sun raised its Phenytoin sodium ER capsule prices on July 24, 2014 and Mylan followed suit on July 16, increasing its WAC prices by 210% to match the others. Amneal did so on September 1, 2014. Taro stayed true to its agreement with its competitors and refused to "███████████████████" after the price increases.

### 17.  Metronidazole 1% gel (Amneal, Mylan, Taro, Sun)

255.    Metronidazole 1% gel, also known by the brand name Metrogel, is a topical treatment for rosacea. In 2013 the annual market for Metro Gel 1% in the United States exceeded $120 million.

256.    Until summer 2014, Sandoz was the only generic manufacturer of the gel form of the drug. In June 2014, Taro, poised to enter the market, arranged a customer allocation with Sandoz.

257.    During calls on June 20 and 25, 2014, Taro's Ara Aprahamian told Sandoz's CW-3 that Taro was targeting a 35% market share upon entry. Aprahamian also identified the accounts that Taro would pursue. Immediately after the calls with Aprahamian, CW-3 reported this information back to his superiors CW-1 and Armando Kellum.

258.    On June 30, 2014, CW-1 recommended relinquishing major customers to Taro. "████████████████████████████████████," he wrote. ████████████ ███████████." Kellum agreed.

259.    The next day, WBAD[18] confirmed to Sandoz that Taro was "██████████ ████████████████████." Kellum responded internally that because Taro was

_____

[18] WBAD is the Walgreens Boots Alliance Development, an entity responsible for arranging purchase prices for both AmerisourceBergen Corp ("ABC") and Walgreens ("WAG"). In

"█████████" a rational player, there should be "█████████" if Sandoz went along and relinquished the ABC and WAG accounts to Taro as requested.

260.    By July 7, 2014, the first part of the agreement had been carried out. Sandoz gave those accounts—representing 20% of Sandoz's total sales of the drug—to Taro.

261.    On July 11, 2014, CW-3 and Aprahamian had further calls to discuss whether Sandoz would relinquish Wal-Mart and other accounts to Taro. CW-3 reported these calls to Armando Kellum.

262.    On July 18, 2014, CW-1 reminded his Sandoz colleagues that in Taro's offers to Wal-Mart and other customers, Taro had not severely undercut Sandoz's prices. "████████
██████████████████████████," he wrote. █████████████████████████
█████████████." Kellum once again agreed.[19]  Sandoz ultimately ceded the Wal-Mart account and one more account to Taro.

### 18.  Clotrimazole 1% Cream (Sandoz, Taro)

263.    Clotrimazole cream, also known by the brand name Lotrimin AF Cream, is an antifungal medication. In January 2015, as a result of supply constraints, Sandoz was targeting only up to 20% as the last entrant to a four-player market. The incumbent competitors were Taro, Glenmark and Major.

264.    On January 12, 2015, CW-3 was asked by his Sandoz colleague to "get a price point" for Sandoz's planned entry. CW-3 called Ara Aprahamian, who gave him Taro's non-

Plaintiffs' earlier complaint, 19-cv-6044, WBAD is named as a defendant and the role of major distributors in the conspiracy is explored in detail.

[19] The first email in the thread had included the phrase "██████████████████████," referring to Taro, but someone at Sandoz later altered it to say "████████████████████
███████." Sandoz made this change to avoid documenting the fact that the competitively sensitive information was learned directly from its competitor, Taro.  The original language was preserved in older versions of the email thread.

FILED WITH REDACTIONS – PUBLIC VERSION

public pricing for both wholesale and retail customers. CW-3 told Aprahamian that Sandoz had a limited supply of Clotrimazole cream and planned to target Wal-Mart and Walgreens only. CW-3 took notes during the call and relayed the price points to the Sandoz colleague, who was the director in charge of the product launch.

265.    Aprahamian and CW-3 had follow-up calls on January 13 and 29, and Aprahamian personally wrote to Wal-Mart to cede that business to Sandoz. Consistent with the plan, Glenmark ceded the Walgreens account to Sandoz in March 2015.

I.    **Collusion between Perrigo and Sandoz**

**19.    Bromocriptine Mesylate Tablets (Perrigo, Sandoz)**

266.    Bromocriptine mesylate tablets, also known by the brand name Parlodel,,are used to treat abnormally high levels of prolactin in the blood, pituitary disorders, and Parkinson's disease.  In early 2013 the competitors were Sandoz (65% market share), Perrigo (30%), and Mylan (5%).

267.    On March 4 and 10, 2013, Sandoz senior sales executive CW-4 had calls with Mylan's Jim Nesta to confirm that Mylan was having trouble supplying Bromocriptine. Sandoz then decided that the tenuous supply situation was an opportunity to increase prices,

268.    On March 31, 2013, the members of the Sandoz Pricing Committee (including Armando Kellum and CW-1) approved the price increase plan. The next day, Sandoz's CW-3 called T.P. at Perrigo. They spoke again the following morning. On that second call, CW-3 read out his list of the drugs and the amount of the upcoming increases:

**FILED WITH REDACTIONS – PUBLIC VERSION**



269.    On April 5, 2013, Sandoz implemented the Bromocriptine price increase, with WAC increases of up to 200%.

270.    On May 29 and 31, 2013, Sandoz's CW-3 had calls with Mylan's Jim Nesta. Also on May 31, 2013, Mylan re-entered the Bromocriptine market with WAC prices that matched Sandoz's new, elevated prices.

271.    On July 30, 2013, CW-3 and T.P. of Perrigo discussed that fact that Perrigo had not followed the Sandoz and Mylan price increases. T.P. assured CW-3 that Perrigo would not take Sandoz's business at a large wholesaler, McKesson.  CW-3 later reported that it was not a question of whether Perrigo would follow, but when. With assurances that Perrigo would respect the price increase and not poach customers, Sandoz and Mylan kept their prices elevated.

272.    Perrigo ultimately joined the Bromocriptine price increase in October 2014 after a call between CW-3 and T.P. on October 2, which T.P. immediately reported to his Perrigo supervisor John Wesolowski.

### 20.    Adapalene Cream (Perrigo, Sandoz)

273.    As described above, in 2010 Fougera and Perrigo colluded to allocate market share to Perrigo upon its entry into the Adapalene cream market in October 2010.

FILED WITH REDACTIONS – PUBLIC VERSION

274.     By June 2013, Sandoz (having acquired Fougera) had been absent from the market for several months but was ready to re-enter.

275.     On June 24, 2013, approximately one month before Sandoz's re-launch, CW-3 and T.P. of Perrigo had a ten-minute call during which T.P. shared Perrigo's non-public dead net pricing for two accounts. T.P. mentioned that Perrigo wanted to keep Walgreens. T.P. provided further details and explained Perrigo's intentions during a discussion about prices on July 17, 2013. CW-3 took notes during these calls, as seen here:



The purpose of conveying these price points was so that Sandoz, upon re-entry, could target specific agreed-upon customers with the highest prices possible, and thereby minimize price erosion. CW-3 reported his conversations to his Sandoz superiors and the details from his conversations were repeated as "intel" within Sandoz.

276.     Throughout August 2013, CW-3 and T.P. continued talking to ensure that Sandoz was targeting accounts that Perrigo was willing to concede. Perrigo ceded a number of accounts to Sandoz and Sandoz refrained from bidding for the Walgreens business.

FILED WITH REDACTIONS – PUBLIC VERSION

277.    However, by December 2013, Sandoz had only 30% of a two-player market. This was partly because Wal-Mart had refused to switch to Sandoz (it considered its supply contract with Perrigo too fresh to be revisited).

278.    On January 8, 2014, Sandoz convened a meeting to discuss Adapalene cream and the possibility that the Walgreens account, which represented 19% of the market, could bring Sandoz up to its fair share. CW-3 knew this would violate the agreement with Perrigo, so he had a talk with T.P. They spoke again on January 31, 2014, the day after Sandoz had met with Walgreens to discuss Adapalene cream, among other drugs.

279.    Perrigo ultimately ceded the Walgreens account to Sandoz, which brought Sandoz's share back to 47%, the same percentage it had before exiting the market in 2010.

### 21. Calcipotriene-Betamethasone Dipropionate Ointment (Perrigo, Sandoz)

280.    Calcipotriene-Betamethasone dipropionate ointment ("CBD ointment" or "Cal Beta"), also known by the brand name Taclonex, is a vitamin D analogue and corticosteroid combination drug that treats psoriasis.

281.    In February 2014, both Perrigo and Sandoz were planning to launch the first generic versions of the drug. At the end of February, T.P., a sales executive at Perrigo, had two calls with CW-3, a senior sales executive at Sandoz, during which T.P. asked when Perrigo would launch. CW-3 did not know the answer at the time, but he did call T.P. on March 13, 2014, the same day that Sandoz had a meeting to discuss the launch of Cal-Beta.

282.    Also on March 13, 2014, Perrigo scheduled its own teleconference to discuss the launch. The teleconference took place the next day, and Perrigo circulated a document that anticipated winning 50% market share and a Sandoz entry on March 31, 2014. (Sandoz did ultimately launch on that day, and Sandoz also had a 50% share target).

**FILED WITH REDACTIONS – PUBLIC VERSION**

283.     On March 17, 2014, CW-3 called T.P. at Perrigo to resume their discussions about customer allocation and to exchange pricing information for various tiers of customers. Each explained his company's position on how customers should be divided between them to achieve "fair share." Specific accounts were discussed. They had several more calls in the following three days, which T.P. reported to his supervisor, John Wesolowski. In between calls with CW-3, T.P. often called Wesolowski to asked how he should respond. On the Sandoz side, Armando Kellum and CW-1 joined CW-3 on at least one of these Cal Beta calls with Perrigo. CW-3 took notes.

284.     T.P. and CW-3 together came up with groupings of larger and smaller customers that would balance out so that each manufacturer would have around 50% market share. Following the plan, Perrigo and Sandoz bid on and won their allocated customers. Wesolowski specifically instructed the Perrigo sales team that certain customers were not to be approached in order to ensure that they did not target customers beyond the agreement.

### 22.  Tacrolimus Ointment (Perrigo, Sandoz)

285.     Tacrolimus ointment, also known by the brand name Protopic, is a secondary treatment option for moderate to severe eczema. In August 2014, Sandoz and Perrigo were both preparing to launch Tacrolimus. Sandoz had the first-to-file generic rights and Perrigo had the authorized generic rights (the "AG").

286.     On September 8, 2014, the Sandoz commercial operations team held a meeting during which they discussed the Tacrolimus launch. That same day, Sandoz's CW-3 called T.P. at Perrigo four times and they spoke for at least seventeen minutes. On those calls, CW-3 and T.P. discussed the Tacrolimus launch and decided to model it after the CBD ointment launch. As discussed above, in the spring of 2014 CW-3 and T.P. had colluded on CBD ointment when Sandoz was entering as the first-to-file generic and Perrigo as the AG. By using CBD ointment as

- 78 -

a model, the competitors would not have to spend significant time negotiating the allocation of customers for Tacrolimus. "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮" wrote CW-3.

287.    On September 10, 2014, CW-3 again called T.P. to discuss the Tacrolimus launch. They specifically discussed the allocation of certain customers, as had been done with Cal Beta, so that each competitor could reach 50% share. T.P. provided CW-3 with Perrigo's WAC and AWP pricing and dead net pricing for various classes of customer. CW-3 took notes:



288.    Sandoz launched Tacrolimus ointment on November 19, 2014 and Perrigo launched the next day. They each won the customers as had been allocated by T.P. and CW-3.

### 23.  Methazolamide Tablets (Perrigo, Sandoz)

289.    Methazolamide, also known by the brand name Neptazane, is used to treat ocular conditions where lowering intraocular pressure would be beneficial, including several types of glaucoma.

290.    On March 6, 2014, Perrigo formally launched Methazolamide tablets. Perrigo knew prior to its launch that Sandoz, its only competitor, was out of the market with supply issues

FILED WITH REDACTIONS – PUBLIC VERSION

and was not expected to re-enter until the summer. Perrigo thus entered at a price 136% higher than Sandoz's last price. Perrigo anticipated the Sandoz would re-enter and the two would settle on a market share split of 50% to 50%

291.    At the end of June 2014, Sandoz began selling the 25mg tablets (but not the 50mg) at a WAC price of $129.84 compared to Perrigo's price of $306.47. John Wesolowski was upset that Sandoz had not reached out to Perrigo to confirm the new, higher price level. "███████ ███████████████████████████████████████████," he wrote to senior Perrigo executive Doug Boothe.

292.    To remedy this, on October 21, 2014, Perrigo's T.P. called CW-3 at Sandoz. T.P. provided Perrigo's increased prices to ensure that Sandoz would match, including for the upcoming 50mg tablet.

293.    By November 5, 2014, the Sandoz pricing team had been instructed to remove the current Methazolamide prices from any contracts because it would soon be "███████████" at a "███████." T.P. and CW-3 had another two calls on November 10, 2014.

294.    On December 5, 2014, Sandoz launched its 50mg tablets at a WAC price identical to Perrigo's, and also increased the 25mg price to match Perrigo's.


J.    **Collusion between Glenmark and Sandoz**

295.    In August 2012, not long after Sandoz acquired Fougera, Defendant Mitchell Blashinsky, who had recently joined Glenmark as Vice President of Sales and Marketing, approached Sandoz's CW-3 at the NACDS conference in Denver, Colorado. During their conversation over breakfast at the Marriott hotel, Blashinsky told CW-3, among other things, "we can make a lot of money" and "we can work together on pricing."

296.     Over the next two years, the two competitors did "work together" on both market allocation and pricing—speaking at least fifty times. Their communications were all collusive in nature. CW-3 and Blashinsky were not friends and had no other reason to speak except to coordinate anticompetitive conduct. Sandoz and Glenmark conspired to fix prices and allocate markets for multiple drugs, as described below.

### 24. Fluticasone Propionate Lotion (Glenmark, Perrigo, Sandoz)

297.     Fluticasone Propionate lotion, also known by the brand name Cutivate, is a topical corticosteroid used to treat swelling and itching that result from various chronic skin disorders.

298.     In 2012 Glenmark became the first generic manufacturer of the drug. Perrigo and Sandoz were prepared to enter the market at the end of Glenmark's 180-day exclusivity period.

299.     On August 21, 2012, Sandoz's Armando Kellum wrote to his sales team to find out "█████████████." Within minutes of receiving that email, CW-3 called T.P., his contact at Perrigo. Sandoz learned that Perrigo's launch had been delayed to the first quarter of 2013. In accordance with the rules of fair share, the Sandoz team noted that "████████████████

███████████████████████████████

████████████████."

300.     On November 26, 2012, Sandoz scheduled an internal meeting to discuss which customers to approach as part of its Fluticasone launch. That same day, CW-3 called Mitch Blashinsky at Glenmark twice. After the second call, CW-3 circulated to his Sandoz colleagues a list of six customers that Sandoz wanted to target. CW-3 also made it known to his Sandoz colleagues that Glenmark was planning a price increase on Fluticasone.

301.     On November 28, 2012, CW-3 circulated an updated list of customers based on further conversations with Blashinsky. When a senior Sandoz marketing executive emailed to ask for pricing details, Bihari suggested that they talk on the phone instead.

302.    On December 3, 2012. Sandoz officially entered the market for Fluticasone,

CW-3 called Blashinsky, and Blashinsky directed the Glenmark sales team to relinquish two

specific accounts to Sandoz. These were the first two of nine customers that Glenmark had agreed

to give up to the new entrant.

303.    In the following weeks, Sandoz stuck to the plan and refused to respond to

customers it had not agreed to target, but by January 11, 2013, it seemed that the division of

customers organized by CW-3 and Blashinsky had not resulted in a fair market share balance.

████████████████████████████████████████████████" wrote CW-1 in an

internal summary, but a "████████████████████" for Sandoz would have been

30%, because the brand manufacturer had 43%.  During a meeting on January 21, 2013, CW-3

was assigned to call Blashinsky to explain that Sandoz wanted to rebalance the shares by taking

CVS from Glenmark. CW-3 recorded this in his notes as "call MB, going to CVS":



304.    Over the next several months, Sandoz and Glenmark continued to coordinate

Fluticasone customer allocation and price increases. On April 16, 2013, as Glenmark was

readying a wide set of prices increases, CW-3 had two calls with Blashinsky.

305.    Perrigo was slower to launch the drug, but eager to join the collusion. Perrigo held

an internal meeting to discuss its Fluticasone launch on July 16, 2013. T.P. called CW-3 at

Sandoz on the day of that meeting and they had a nineteen-minute call the next day, during which

T.P. informed CW-3 that, consistent with the "fair share" understanding, Perrigo was targeting specific Glenmark customers and looking for approximately 25% share. CW-3 again took notes.

306.    On August 1, 2013, Perrigo formally launched the product with the exact same WAC pricing as Glenmark and Sandoz. Perrigo targeted several Glenmark customers, which Glenmark immediately conceded.

### 25. Desoximetasone Ointment (Glenmark, Sandoz, Taro)

307.    Desoximetasone ointment, also known by the brand name Topicort, is a corticosteroid used to treat a variety of skin conditions, including eczema and dermatitis. In August 2012 Taro was the sole supplier of the drug and Sandoz was planning an entry.

308.    On August 21, 2012, a Sandoz executive wrote internally that the Desoximetasone launch needed to avoid "███████." The next morning, a national account executive at Sandoz named K.K. had a call with a senior sales executive at Taro named D.S.

309.    On August 30, 2012, Sandoz held a meeting to discuss the launch and K.K. again called D.S. at Taro.

310.    On September 21, 2012, as Sandoz was finalizing its launch plan, Sandoz's CW-3 had a call with H.M., an account executive at Taro, to coordinate Sandoz's entry into the market. CW-3 and H.M. were not friends and nearly all their conversations were collusive in nature. H.M. provided CW-3 with Taro's price points for various customers so that, upon entry, Sandoz could bid as high as possible to avoid price erosion while still obtaining new customers. CW-3 passed the pricing information and the list of customer targets to his bosses CW-1 and Armando Kellum.

311.    On September 28, 2012, Sandoz formally launched Desoximetasone and matched Taro's WAC prices exactly. CW-3 and H.M. called each other and left voicemails.

312.    Consistent with the understanding in place between the two competitors, Taro immediately began conceding customers to Sandoz. Taro had been aware of Sandoz's launch "█

FILED WITH REDACTIONS – PUBLIC VERSION

some time" and expected to relinquish "████████████████████" to Sandoz. By coordinating with Taro, Sandoz was able to obtain most of its target share quickly. The Sandoz executive who had been worried about "█████████" noted "████████████████████████████████ ████████."

313.    One year later, in August and September 2013, it was Glenmark's time to coordinate with Taro and Sandoz for its own launch of Desoximetasone ointment. Calls between the three competitors included at least the following:

| Desoximetasone Ointment Conspirator Communications | | | |
|---|---|---|---|
| **2013 Phone Call Dates** | **GLENMARK** | **TARO** | **SANDOZ** |
| Aug. 15, 20-21, Sept. 5, 26 | Blashinsky | Aprahamian | |
| Aug. 20 | D.I. | | S.G. |
| Aug. 27-28, Sept. 23 | Blashinsky | Perfetto | |
| Aug. 28, Sept. 23, 26 | | Aprahamian | CW-3 |
| Sept. 6 | | D.S. | CW-4 |
| Sept. 23, 26 | Blashinsky | | CW-3 |

314.    During these calls, the competitors reached an understanding about which customers Glenmark would target and what prices it would offer in order to avoid price erosion. Because Taro still had a majority of the market share, it understood pursuant to the "fair share" understanding that it would be the primary target of Glenmark and would have to relinquish market share to Glenmark as it entered.

315.    Taro began to concede customers to Glenmark immediately. By October 17, 2013, CW-5 reported internally that Glenmark had already been able to obtain 30% market share for Desoximetasone.  Because of the discussions between the competitors in advance, and because prices remained high, Taro was not upset about conceding this business to Glenmark.

Taro executives continued to stress that " ███████████████████████████████"
and " ████████████████████████████."

### K.    Collusion between Aurobindo and Sandoz

316.    In August 2012, when Sandoz acquired Fougera, CW-6 left his job at Fougera and started working at manufacturer Defendant Aurobindo. CW-6 was friends with Defendant Jim Grauso, who had moved to Aurobindo in December 2011. As described above, CW-6 had colluded with Grauso back when Grauso was at G&W and CW-6 was at Fougera. Even after leaving G&W, Grauso had served as conduit for calls between CW-6 and G&W's Kurt Orlofski and Erika Vogel-Baylor.

317.    CW-6 had specialized in topical products (creams, lotions), so he did not have many contacts at generic companies that focused on oral solids (pills, tablets). One person he knew was CW-3, who had remained behind at Sandoz / Fougera. Although CW-6 and CW-3 were not social friends, they began to collude on Aurobindo-Sandoz overlap products.

318.    Between August 2012, when CW-6 joined Aurobindo, and May 2013, when CW-6 left the industry, he had at least one hundred and nine calls with CW-3. His superior, Grauso, was aware of and approved of these market allocation and price fixing calls.

### 26.    Oxacillin Sodium, Nafcillin Sodium Injectable Vials (Aurobindo, Sandoz)

319.    Oxacillin Sodium ("Oxacillin") and Nafcillin Sodium ("Nafcillin") are two separately marketed antibiotics used to treat infections caused by penicillin-resistant staphylococci, among other bacteria. In December 2012, Aurobindo began making plans to enter the Nafcillin and Oxacillin markets as a third entrant, alongside Sandoz and Sargent Pharmaceuticals.

FILED WITH REDACTIONS – PUBLIC VERSION

320.    On December 12, 2012, Aurobindo's CW-6 and Sandoz's CW-3 spoke several times to discuss pricing and the allocation of market share to the new entrant, Aurobindo. He kept his Aurobindo supervisor, Defendant Grauso, informed of his conversations with CW-3.

321.    On December 26, 2012, Aurobindo launched Nafcillin at WAC prices that essentially matched Sandoz's prices. CW-6 had several more calls with CW-3 in the days leading up to the launch, and reported the substance of the discussions to Grauso.

322.    On January 4, 2013, CW-6 had another call with CW-3.

323.    On January 6, 2013, a Sandoz internal review noted that Aurobindo would soon enter the Oxacillin marked and the recommended strategy was to "shed customers to Aurobindo," just as had been done with Nafcillin, in order to "maintain current pricing for as long as possible" Regarding Oxacillin, Sandoz.

324.    On January 22, 2013, Aurobindo launched Oxacillin, again at WAC prices that essentially matched Sandoz's prices. CW-6 had a call with Grauso and then called CW-3 at Sandoz.

### 27.  Cefpodoxime Proxetil Oral Suspension and Tablets (Aurobindo, Sandoz)

325.    Cefpodoxime Proxetil ("Cefpodoxime"), also known by the brand name Vantin, is an antibiotic used to treat a wide variety of bacterial infections. It is sold in both oral suspension and tablet form.

326.    On January 7, 2013, CW-6 of Aurobindo and CW-3 of Sandoz had three calls, during which CW-6 confirmed that Aurobindo planned to launch both formulations of Cefpodoxime that week. CW-3 told CW-6 that Sandoz planned to increase pricing on both formulations by 20%. CW-6 advised that Aurobindo was looking for 40% share and would start by targeting Cardinal and CVS. In turn, CW-3 gave his competitor specific non-public contract

**FILED WITH REDACTIONS – PUBLIC VERSION**

price points that Sandoz was charging to those customers. CW-6 then said "follow the plan and we'll be reasonable." During the call CW-3 took the notes pictured below:



327.     On January 11, 2013, Sandoz increased WAC pricing on Cefpodoxime. CW-3 and CW-6 had three more calls. Afterwards, they each called their superiors to report back what they had discussed. CW-3 called his Armando Kellum and CW-6 called Jim Grauso.

328.     Aurobindo had manufacturing problems and was not able to launch until April 2013. On April 18, 2013, Aurobindo launched both formulations of Cefpodoxime and matched Sandoz's increased WAC pricing. CW-6 again called CW-3.

329.     On April 30, 2013, CW-3 and CW-6 further discussed the allocation of customers between Sandoz and Aurobindo and how much share each customer was worth. CW-3 took notes.

330.     By August 2013, Sandoz had been able to give Aurobindo a 22% share of the market without substantially eroding the "███████" of the drug, but both recognized that 22% was not a fair share in a two-player market.  Aurobindo thus continued to seek share and Sandoz continued to relinquish accounts to Aurobindo.

FILED WITH REDACTIONS – PUBLIC VERSION

L.    **Collusion between Rising and Sandoz**

28.  **Griseofulvin Microsize Tablets (Rising, Sandoz)**

331.    Griseofulvin microsize tablets, also known by the brand name Grifulvin V, are used to treat fungal infections of the skin, hair, or nails that do not respond to creams or lotions.

332.    In September 2013, Rising had almost all the market share for this drug and Sandoz was planning to launch its generic. Sandoz estimated that it could achieve $2.5 million "█ ███████████████████████████."

333.    On October 1 and 2, 2013, CW-2, then a senior sales executive at Rising, had several calls with Sandoz's CW-3 and with a Sandoz sales executive named L.J. During these calls they discussed pricing for Griseofulvin and the allocation of market share to the new entrant, Sandoz.

334.    On October 4 and October 9, 2013, Rising deliberately submitted high bids to two large customers so that Sandoz could win their business.

335.    From October 16 to October 21, 2013 CW-3 and CW-2 continued to call one another to make lists of the specific customers to be allocated between Sandoz and Rising. CW-3 took notes of these conversations. Sandoz did pursue these accounts and Rising did cede them to Sandoz.

336.    The collusion continued one year later. On October 1,2, 8, and 13, 2014, Rising's CW-2 had several calls with L.J. at Sandoz, during which they discussed a potential price increase. They also met in person and discussed the price increase over drinks. CW-3 later reported what he had learned to his Sandoz superior CW-1. As was customary, CW-3 wrote that he had heard about the price increase from an anonymous "customer" in order to disguise the truth that he had been talking directly with CW-2.

337.     On October 15, 2014, Rising increased its WAC prices for Griseofulvin.  Sandoz was not immediately able to follow the increase because of price protection clauses in its supply contracts.

338.     By July 27, 2015, Sandoz was free of the price protection concerns and decided to increase. Because Sandoz knew that Rising would not seek to take any of its customers after the increase, a Sandoz pricing executive noted Sandoz could assume "0% volume loss," meaning that Sandoz would sell the same number of tablets but at a higher price.

## M.     Collusion between Mallinckrodt and Sandoz

During CW-3's time at Fougera, he worked for Defendant Walt Kaczmarek and with K.K., another Fougera sales executive. Not long after the Sandoz acquisition of Fougera in July 2012, Kaczmarek and K.K. began working for Mallinckrodt. Kaczmarek became a senior executive and K.K. took a senior sales executive position. Beginning in late 2012, these former colleagues used the long-standing relationships collude on overlapping products, as described below.

### 29.    Methylphenidate Immediate Release and Extended Release Tablets (Actavis, Mallinckrodt, Sandoz, Sun)

339.     Methylphenidate hydrochloride, also known by the brand name Ritalin, is used to treat attention deficit disorder and attention deficit hyperactivity disorder, as well as some sleep disorders. There are two tablet formulations of Methylphenidate: an Immediate Release tablet ("Methylphenidate IR") and an Extended Release tablet ("Methylphenidate ER").

340.     As of November 2012, there were three IR competitors: Watson (Actavis), Mallinckrodt, and Sandoz.  There were only two ER competitors: Mallinckrodt and Sandoz.

341.    On February 13, 2013, Sandoz's CW-3 called K.K. at Mallinckrodt to discuss Mallinckrodt's supply problems and prognoses. Immediately after hanging up with K.K., CW-3 called Ara Aprahamian, who was then a sales executive at Actavis, to discuss Actavis's supply and market share intentions. CW-3 reported the information back to his superiors but once again, in order to avoid leaving a record of his collusive calls with competitors, he wrote that his sources were unspecified "customers." With the information from Mallinckrodt and Actavis, Sandoz began to plan a price increase.

342.    On February 19, 2013, Sandoz internally discussed raising Methylphenidate IR prices by 340% and ER prices by 125%. Sandoz estimated these increases would generate additional profits of $12.9 to $36.0 million in 2013.

343.    On March 1, 2013, CW-3 of Sandoz exchanged at least nine (9) text messages with Defendant Kaczmarek, then a senior executive at Mallinckrodt. Through those text messages, the competitors discussed Sandoz's price increase on Methylphenidate and specific customer accounts. CW-3 took notes. CW-3 had further calls with K.K. at Mallinckrodt and Aprahamian at Actavis on March 6, 2013.

344.    On March 8, 2013, Sandoz increased its WAC prices for Methylphenidate ER by 125% and its WAC prices for Methylphenidate IR by 293% to 449%, depending on the dosage.

345.    On March 11, 2013, Aprahamian had a call with Mike Perfetto, who was now working at Taro. Perfetto then emailed J.K., a senior Taro executive, and G.S., a senior executive at Taro's parent company, Sun, to advise them about the price increases.

346.    On April 2, 2013, Aprahamian told CW-3 that Actavis had followed the Sandoz price increase for Methylphenidate IR. (In reality, that had not yet happened, but Actavis did match Sandoz's increase three weeks later).

**FILED WITH REDACTIONS – PUBLIC VERSION**

347. From April 20-23, 2013, representatives from Sandoz, Mallinckrodt, Actavis, Sun and Taro gathered at an NACDS meeting in Palm Beach, Florida. In attendance were Kaczmarek from Mallinckrodt, G.S. from Sun. and Perfetto and J.K. from Taro.

348. On April 24, 2013, Actavis announced its increased WAC prices for Methylphenidate IR. They matched the increased Sandoz WACs. Two days later, on April 26, 2013, Sun entered the IR market at the same WAC prices. And, one week later, on May 1, 2013, having resolved its supply problems, Mallinckrodt re-entered at the increased WAC prices on both formulations. That same day, Kaczmarek sent a text message to CW-3 of Sandoz.

## N.    Collusion between Greenstone/Pfizer and Sandoz

349. Defendant Greenstone coordinated market allocations and price increases with Sandoz (and its predecessor Fougera) as early as 2010. Sandoz's Armando Kellum had collusive relationships with at least two executives at Greenstone, Jill Nailor and Robin Hatosy. Sandoz's CW-1 also colluded with Hatosy. Before he left Fougera, CW-6 had colluded with Nailor.

350. From January 2011 to October 2014, Sandoz/Fougera and Greenstone conspired to fix prices and allocate markets of multiple products, including Clindamycin Phosphate gel, lotion, solution, and cream, Latanoprost drops, and Eplerenone tablets.

351. During this time period, Greenstone was owned and operated by Pfizer's offices in New Jersey. During all times relevant to this Complaint, Greenstone has not had its own President, Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, or Chief Commercial Officer. The highest-ranking position at Greenstone has been the General Manager, a position held by a Pfizer employee that reports directly to higher-level executives at Pfizer. In 2016, General Manager Jim Cannon explained in an interview that "Greenstone is a wholly owned subsidiary of Pfizer and most of our products are authorized generics for Pfizer brand

**FILED WITH REDACTIONS – PUBLIC VERSION**

products." Pfizer treats Greenstone as an internal business unit rather than as a separate and independent entity, and it controls and directs Greenstone's marketing and sales of drugs.

352.    In many important respects, Pfizer and Greenstone operate as a single entity. In the same interview, the General Manager described Greenstone as "Pfizer's generics provider" and said it "enjoy[ed] the advantages and resources of being part of" Pfizer. Indeed, Pfizer performs many of the business functions of Greenstone that an independent corporate entity would typically perform on its own. Despite having gross sales of over one billion dollars, Greenstone does not have its own finance, accounting, legal, customer services, human resources, operations, or information technology departments. All of those functions are performed by Pfizer.

353.    Most of Greenstone's "employees" are actually employed by Pfizer, including Hatosy and Nailor, who used @pfizer.com email addresses, used Pfizer mobile devices, were paid by Pfizer, were awarded shares of Pfizer stock, and were reimbursed by Pfizer for trade association expenses. Jill Nailor regularly received "Pfizer Senior Leader Excellence Profile" performance evaluations. Greenstone "employees" are identified on Pfizer's organizational charts as a team within Pfizer's "Pfizer Essential Health" ("PEH") or "Global Established Pharmaceuticals" divisions.

354.    Because Greenstone operates as part of Pfizer, Pfizer is directly involved in the generics business and extensively evaluates generic competitors, price erosion in the generic industry, and other strategic issues on behalf of Greenstone. For new products in particular, Pfizer makes the budget, defines the costs of goods sold, and conveys that information for Greenstone to use. Pfizer performs all financial analyses, sales reports, revenue projections, and other finance

functions for Greenstone. Greenstone does not have the authority to implement price increases, including the price increases discussed below, without obtaining approval from Pfizer.

355.    Greenstone and Pfizer management regularly coordinate on strategy, and communicate about concepts such as "fair share," "responsible pricing" and following other competitors' price increases in particular generic drug markets. For example, in a PEH presentation in January 2017 relating to Greenstone, a dual Pfizer/Greenstone employee explained the strategy behind the "fair share" concept, and indicated that Greenstone should simply maintain market share in markets that were considered stable.

356.    For these reasons, although technically Greenstone is a separately incorporated entity, it is separate in name only. Any actions attributed to Defendant Greenstone throughout this Complaint, including specifically those of Jill Nailor or Robin Hatosy, are actions taken, directed and/or controlled by Defendant Pfizer.

### 30.  Clindamycin Phosphate Cream, Gel, Lotion, and Solution (Greenstone, Perrigo, Sandoz, Taro)

357.    Clindamycin Phosphate ("Clindamycin"), also known by the brand names Cleocin T, Clinda Max, and Clinda-Derm, among others, is a topical antibiotic used on the skin to stop the growth of certain bacteria that cause acne. Formulations include cream, gel, lotion, and solution.

358.    At all times relevant to this complaint, Fougera (and later Sandoz, after its acquisition of Fougera) and Greenstone were the primary players in the markets for the four formulations of Clindamycin.[20] In each of those markets, Sandoz and Greenstone adhered to the "fair share" understanding and coordinated several significant price increases.

---

[20] In late 2013 Taro and Perrigo did enter the market for the solution and coordinated with Sandoz and Greenstone to keep prices elevated.

FILED WITH REDACTIONS – PUBLIC VERSION

359.    On November 2, 2010, Fougera was considering increasing the price of Clindamycin solution. To decide the amount of the increase, Fougera needed to figure out Greenstone's prices. Fougera's CW-6 had a call Jill Nailor at Greenstone. That same day, Fougera decided to increase WAC prices by 320% and to increase contract prices up to 700%. CW-6 did not generally have calls with Nailor for social reasons.

360.    Based on these communications, Fougera knew that Greenstone would follow the price increase, but did not know exactly when. In January 2011, CW-6 was asked if there was "██████████████████████████████████" and he responded that the price increase was coming and that he had "████████." CW-6 had left a voicemail for Nailor at Greenstone to obtain details about the timing of Greenstone's increase.

361.    Greenstone did not implement its own price increases until July 2011. This lag in the conspiracy led Fougera to gripe that the "██████" at Greenstone were "████████████████ and "██████████." Despite these frustrations, Fougera refused to bid on any of Greenstone's accounts. The market shares "████████████████████████████████" wrote a Fougera executive to Walter Kaczmarek, "████████████████████" from any Greenstone customers. Kaczmarek agreed: "████████."

362.    By August 2012, Greenstone had raised prices of the gel and was considering Clindamycin solution as a candidate for further price increases. Greenstone's Robin Hatosy had a call with Sandoz's Armando Kellum on August 8, 2012.

363.    On August 22, 2012, Kellum recommended that Sandoz also increase its prices for all the Clindamycin formulations. His rationale was that Greenstone had "████████████ ████████████████████████," which referred to his recent successful collusion with Greenstone to raise prices of prost eye drops (this drug is discussed in further detail below), and

FILED WITH REDACTIONS – PUBLIC VERSION

his confidence from his conversations with Hatosy that Greenstone would agree to follow another price increase.

364.     On August 29, 2012, Kellum received detailed information about Sandoz's proposed Clindamycin price increases. He spoke with Hatosy over the phone and then voted in favor of an increase for all Clindamycin products.  He later told colleagues that Greenstone would "act rationally as they did recently with Latanoprost" and would follow the price increase.

365.      On the morning of October 19, 2012. Kellum had another call with Hatosy. The Sandoz price increases for all four formulations became effective that day and the drugs became were 77%, 107%, 150% and 187% more expensive. Kellum and Hatosy had texted one another the prior evening.

366.     Greenstone acted more quickly on this round and announced its own increases to its customers on November 27, 2012, although they did not become effective and publicly visible until December 27. In the interim, Sandoz refused to reduce its own price or supply Greenstone customers because it knew that Greenstone would follow the price increase.  By May 2014 these illegally-coordinated price increases gave Sandoz an additional $61,000,000 in net sales.

367.     In the summer of 2013, Taro and Perrigo began preparing to enter the Clindamycin solution market and began to coordinate their entries with Greenstone and Sandoz.

368.     On June 6, 2013, Taro's Ara Aprahamian held a meeting to discuss the market share dynamics and strategy for Clindamycin. The next day, he called CW-3 at Sandoz.

369.     Throughout August 2013, Taro, Perrigo and Sandoz communicated regarding the Clindamycin solution. Perrigo's Douglas Boothe had calls with Taro's Michael Perfetto. CW-3 shuttled collusive information between Aprahamian at Taro and T.P. at Perrigo, as seen in the table below.

| Clindamycin Conspirator Communications in August 2013 | | | |
|---|---|---|---|
| **2013 Phone Call Dates** | **PERRIGO** | **TARO** | **SANDOZ** |
| August 1 | T.P. | | CW-3 |
| August 5 | | Aprahamian | CW-3 |
| August 6 | T.P. | | CW-3 |
| August 7 | Boothe | Aprahamian Perfetto | CW-3 |
| August 8 | Boothe | Aprahamian Perfetto | CW-3 |
| August 12, 14-15 | T.P. | | CW-3 |
| August 21 | Boothe | Perfetto | |
| August 26 | | Aprahamian | CW-3 |

370.     On September 9, 2013, Perrigo entered the market for Clindamycin solution. Having coordinated with Taro and Sandoz, Perrigo quickly obtained two large accounts.

371.     On October 2, 2013, CW-3 had a call with Aprahamian during which they discussed specific pricing and which customers Taro should approach as it entered the market. That same day, Aprahamian created a pricing spreadsheet with the information he had learned from CW-3. At the time Greenstone had over 80% share of the Clindamycin solution market, due to Sandoz supply disruptions. Consistent with the fair share understanding, Taro aimed for Greenstone customers and avoided taking share from Perrigo and Sandoz.

372.     On October 11, 2013, Taro held an internal meeting regarding the Clindamycin launch. Aprahamian had three calls with CW-3 at Sandoz. CW-3 was in communication with T.P. at Perrigo and was able to pass confidential Perrigo pricing information to Taro.

373.     On October 28, 2013, Taro launched Clindamycin solution at WAC prices that exactly matched Sandoz, Greenstone, and Perrigo's prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

374.    Collusion between Greenstone, Perrigo, Sandoz and Taro continued into 2014.

Sandoz fixed the supply problems that had plagued Clindamycin solution and was able to take

back some market share, although Kellum noted that Sandoz needed to "███████████████

████████████████████████" of the solution sales because Greenstone and Sandoz

"████████████████████████████████████████."

375.    These coordinated efforts to increase prices and minimize price erosion were very

successful, as shown in a Greenstone presentation:



376.    By April 2014, Sandoz was ready to increase Clindamycin prices yet again. On

April 2 and 4, 2013, Sandoz's Armando Kellum had multiple calls with Greenstone's Jill Nailor,

because Greenstone was the only other manufacturer of the cream, lotion, and gel forms.

According to the available phone records, this was the first time Kellum and Nailor had ever spoken over the phone. As a result of these calls, Sandoz understood that Greenstone would follow its price increases. They also discussed a separate price increase on Eplerenone tabs (discussed below).

377.    On April 18, 2014, Sandoz increased its WAC prices for Clindamycin gel, lotion and cream. In May 2013, Greenstones Hatosy called Kellum at Sandoz twice, leaving him a voicemail, before Greenstone followed the Sandoz Clindamycin increases. They did not speak again for nearly three (3) months.

378.    In May 2014, when a Sandoz marketing manager wrote that Sandoz should not pusue a customer "████████████," he was referring to the need to honor the fair share understanding with Greenstone and the agreement to raise prices for Clindamycin.

### O.    Collusion between G&W and other manufacturers

379.    Defendant G&W's price-fixing program was organized by Erika Vogel-Baylor at the direction of her supervisor, Kurt Orlofski. Together they thousands of phone calls and texts with competitors at Lupin, Glenmark, Greenstone, Aurobindo, Actavis, Amneal, Wockhardt, and other Defendants. Vogel-Baylor also directed her own subordinates to collude with competitors, including an individual, K.K., who had previously worked at Wockhardt and had a collusive relationship with CW-3 at Sandoz.

380.    In May 2013, Vogel-Baylor was asked to put together a report for management regarding G&W's sales goals for the coming year. After listing out a number of G&W's price increases from 2012 – all of which were the subject of collusion and are discussed at various points throughout this Complaint – Vogel-Baylor concluded: "We remain very upbeat to be

playing in the topical and suppository market where there continues to be limited to no competition."

### 31.  Halobetasol Propionate Cream and Ointment (G&W, Perrigo, Sandoz, Taro)

381.    Halobetasol Propionate, also known by the brand name Ultravate, is a strong corticosteroid used to treat a variety of skin conditions, including eczema, dermatitis, psoriasis, and rash. Halobetasol comes in both cream and ointment form. In June 2012

382.    In September 2012, Defendant Erika Vogel-Baylor of G&W and T.P. of Perrigo both had numerous discussions with CW-6 (then at Aurobindo) concerning a coordinated price increase for Halobetasol cream and ointment. Aurobindo did not manufacture either form of Halobetasol, but Vogel-Baylor and T.P. used CW-6 as a conduit to convey information between them about the price increases. They had both developed a relationship with CW-6 when he had worked at Fougera.

383.    On September 19, 2012, Vogel-Baylor and CW-6 texted each other and spoke on the phone. CW-6 then spoke with T.P., and then, immediately afterwards, had another call with Vogel-Baylor. Vogel-Baylor then reported these calls to her G&W boss, Kurt Orlofski. T.P. likewise reported his communication with competitors to his boss, John Wesolowski, a senior executive at Perrigo.

384.    On September 21, 2012, Vogel-Baylor, CW-6, and T.P. repeated this relay pattern of calls.

385.    On September 25, 2012, both G&W and Perrigo announced price increases for Halobetasol Cream and Ointment. The relay call pattern repeated again on September 27, 2012.

386.    On November 6, 2012, Vogel-Baylor instructed a G&W salesperson to submit a cover bid to a customer in order to support the price increase and create a false appearance of

competition between G&W and Perrigo. "We cannot take this from Perrigo," she wrote "so I will give you pricing so that it looks like you are making an attempt to bid."

387.    The competitors colluded to raise the price of Halobetasol again in 2013. This time, there were multiple channels of communication between the competitors. For example, on March 26, 2013, Perrigo's Doug Boothe of Perrigo had a call with Orlofski of G&W. That same day, T.P. of Perrigo called CW-6 and CW-6 relayed the price increase arrangement to Vogel-Baylor

388.    The next day, March 27, 2013, Perrigo increased its WAC pricing for Halobetasol cream and ointment by over 250%. G&W followed with its own increases on April 11.

*Halobetasol: G&W and Perrigo play fair with new entrant Sandoz*

389.    On December 12, 2013, G&W learned that Sandoz was poised to re-enter the Halobetasol cream market and Orlofski noted that G&W "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮." At the time, G&W had 63% share and Perrigo had only 36%. In accordance with fair share, Sandoz planned to "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮."

390.    On December 17, 2013, Sandoz's CW-3 had a call with T.P. at Perrigo during which T.P. provided Perrigo's pricing information for two accounts and agreed to give up one of these accounts to Sandoz. CW-3 took notes of the call. That same day, after her own calls with T.P., Vogel-Baylor wrote to a customer (Rite Aid) "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

391.    In early February 2014, an individual named K.K. joined G&W as a Director of Sales & Marketing.  On February 18, 2014, K.K. wrote to Vogel-Baylor that he had reached out to his friend at Sandoz to discuss Halobetasol.

392.    On February 20, 2014, K.K. reported that CW-4 at Sandoz had said that Sandoz would be satisfied with 30% of the three-player market.  Vogel-Baylor immediately called T.P. at Perrigo. And later that afternoon she had call with Orlofski to recap G&W's fair share talks with Sandoz and Perrigo.

393.    On February 21, 2014, G&W ceded over 33% of its Halobetasol Cream business to Sandoz.

*Halobetasol: G&W, Perrigo and Sandoz play fair with new entrant Taro*

394.    In May 2014, the three manufacturers of Halobetasol cream coordinated with new entrant Taro to allow it to win market share without eroding prices.

395.    Taro's Ara Aprahamian spoke with G&W's Erika Vogel-Baylor on May 7 and with Perrigo's John Wesolowski on May 9.[21] In between these calls, Sandoz, G&W, and Perrigo had calls to discuss the entry.

396.    On June 17, 2014, G&W's K.K. wrote internally "███████████████████████
█████████████████████████████████████████████████████████████████████
██████████████████████████████████."

397.    On June 18, 2014, G&W's Orlofski texted Taro's Mike Perfetto, who in turn had a call with Perrigo's Doug Boothe. The next morning, Orlofski responded internally to K.K. "█
█████████████████████████████████████████████████████████████████████
███████████████." K.K. agreed that "██████████████" giving up share to Taro was "██████████████."

---

[21] Aprahamian would not speak to Vogel-Baylor again until September 2015 and it appears from the available records that this was the only day Aprahamian ever spoke with Wesolowski over the phone.

FILED WITH REDACTIONS – PUBLIC VERSION

## 32. Prochlorperazine Maleate Suppositories (G&W, Perrigo)

398.     Prochlorperazine Maleate Suppositories ("Prochlorperazine"), also known by the brand names Compro and Compazine, are used to treat nausea and vomiting.

399.     Since at least 2011, G&W and Perrigo have been the only generic suppliers of Prochlorperazine. Throughout 2011 and 2012, G&W and Perrigo priced Prochlorperazine similarly and maintained a virtually even split of the market.

400.     In mid-January 2013, Perrigo hired Defendant Doug Boothe as an executive. On January 25, 2013, G&W's Kurt Orlofski called Boothe for the first time ever, according to the available phone records. They met for lunch at Al Dente Ristorante, in Piscataway, New Jersey on March 1, 2013.

401.     On March 7, 2013, Erika Vogel-Baylor e-mailed Orlofski a price increase analysis for Prochlorperazine. Vogel-Baylor recommended increasing WAC pricing by 200% from $35.66 to $106.98.

402.     On March 19, 2013, G&W implemented the 200% increase. That same day, Orlofski called Boothe.

403.     On April 11, 2013, Perrigo announced it would also be increasing its WAC price for Prochlorperazine by 200% from $34.85 to $104.55. Perrigo's plan was to also increase its effective prices to customers after conferring with its competitors.

404.     From April 20 to 23, 2013, Boothe, Orlofski and Vogel-Baylor attended the NACDS conference in Palm Beach, Florida. Boothe and Orlofski had dinner together and then attended a wine tasting event hosted by Upsher-Smith (a co-conspirator generic manufacturer named as a defendant in Plaintiffs' other complaints in this multi-district litigation).

**FILED WITH REDACTIONS – PUBLIC VERSION**

405.     After Perrigo increased its prices, G&W declined to take business from Perrigo in order to play fair. "," wrote a G&W Director of National Accounts to a customer. "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

406.     G&W turned away this business, but a few months later it took the account back as a reprisal for Perrigo having taken G&W's Target account through McKesson's One Stop program. After trading these accounts, the competitors fell back in line with the agreement. By the fall of 2013, the Prochlorperazine Suppositories market was again virtually evenly split between Perrigo and G&W.

### 33. Ciclopirox Solution (G&W, Perrigo, Sandoz)

407.     Ciclopirox solution, also known by the brand names Penlac and Ciclodan, is an antifungal medication used to treat fungal infections of the fingernails and toenails.

408.     As of January 2013, Perrigo and G&W were the two dominant suppliers of Ciclopirox solution, with 46% and 41% share of the market. Sandoz had 7% share.

409.     On April 24, 2013, one day after the NACDS Palm Beach conference, Erika Vogel-Baylor proposed a Ciclopirox solution WAC price increase of 132% (from $16.00 to $37.15 per unit), which she estimated would give G&W an extra $7.6 million in sales per year.

410.     On April 29, 2013, Vogel-Baylor used CW-6 (then at Aurobindo) as a messenger to communicate with both T.P. of Perrigo and CW-3 of Sandoz in order to coordinate the price increase. CW-3 took notes that show he was told about G&W's upcoming WAC and effective contract prices.

411.     On May 7, 2013, Vogel-Baylor and her team began informing customers about G&W's price increases. One member of the sales team wrote "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."

412.     On May 9, 2013, Sandoz's Armando Kellum instructed CW-4, a member of the sales team, to " ███████████ " and not bid on customer in order to support the coordinated increase.

413.     By July 2013, CW-6 had left the drug industry and was no longer available to serve as a conduit between the competitors. On July 30, 2013, Vogel-Baylor had calls directly with T.P. at Perrigo to relay messages to CW-3 at Sandoz regarding the price increases for Ciclopirox solution.

414.     On August 1, 2013, Perrigo raised its WAC prices by 60%. Although G&W was approached by Perrigo customers seeking to avoid the price increase, Vogel-Baylor turned them down and explained that G&W would not take additional share in a four-player market where G&W had 45% share—more than its fair share.

## 34.  Hydrocortisone Acetate Suppositories (G&W, Perrigo)

415.     Hydrocortisone acetate suppositories, also known by the G&W brand name Anucort-HC, are used to treat itching or swelling caused by hemorrhoids as well as ulcerative colitis, proctitis, and other inflammatory conditions.  By June 2013, G&W and Perrigo were the only two manufacturers of this product.

416.     From June 27 to June 30, 2013, representatives from Perrigo and G&W gathered at a McKesson trade show held at the Venetian hotel in Las Vegas. On the first day of the conference, G&W's Erika Vogel-Baylor received a call from a sales executive at Perrigo. Later that day, she wrote an email to the G&W sales team notifying them that G&W would be increasing prices for Hydrocortisone acetate suppositories. The planned price increase would raise WAC prices by 200% and would result in an estimated $27.9 million in increased sales for G&W. " ████████████████████████████████████████████ " wrote a G&W operations manager. " ██████████ " replied Vogel-Baylor.

FILED WITH REDACTIONS – PUBLIC VERSION

417.     On July 8, 2013, T.P. of Perrigo and Vogel-Baylor had a call during which they coordinated their price increases on Hydrocortisone acetate. After that call, both T.P. of Perrigo and Vogel- Baylor reported the substance of their conversations back to their supervisors

418.     On July 9, 2013, the G&W price increase went into effect. That same day, Perrigo notified its customers that it would increase the price of the drug within two days. Perrigo increased its WAC price for the 25mg suppository by 473% to essentially match G&W's price. T.P. again called Vogel-Baylor.

419.     A second round of price increases followed in 2014. On June 11, 2014, Vogel-Baylor emailed her supervisor Orlofski to recommend an increase prices for Hydrocortisone acetate for certain customer contracts. That same day, she called T.P. at Perrigo.

420.     On June 26, 2014, Perrigo prepared its own price increase plan. The analysis assumed zero percent unit loss – Perrigo would sell the same amount of the drug at a higher price because customers would have no other option after the planned increase.

421.     On July 22, 2014, Perrigo notified its customers of the price increases, including a 235% WAC increase. G&W responded quickly because, in the words of a senior G&W executive, "█████████████████████████████████." Price increase notifications were sent out on August 1, 2014 and included a 200% WAC increase. G&W estimated that the increase would lift its Hydrocortisone sales from $41.3 million to $111.3 million per year.

422.     The two competitors continued to coordinate after the price increases. On August 11, 2014, T.P. of Perrigo had a call with Vogel-Baylor and they spoke again one week later.

### 35.  Promethazine HCL Suppositories (Actavis, G&W, Perrigo)

423.     Promethazine hydrochloride, also known by the brand name Promethegan, is a generic antihistamine drug that is used to treat some allergies, nausea, and vomiting. In late 2012 and early 2013, it was manufactured by Actavis, Perrigo, and G&W.

424.    On September 18, 2012, G&W's Erika Vogel-Baylor asked her colleagues to write up a price increase analysis for the drug. That same day, she exchanged thirty-four texts with Defendant Rick Rogerson, a senior pricing executive at Actavis.

425.    The next day, September 19, 2012, Vogel-Baylor used her contact at Aurobindo, CW-6, as a conduit to communicate with T.P. at Perrigo. On these same calls they also discussed a price increase for Halobetasol, as described above. After speaking with CW-6, she reported her conversations to her G&W boss Kurt Orlofski. T.P. reported the call to his boss John Wesolowski.

426.    On September 21, September 27, and October 5, 2012, Vogel-Baylor and T.P. continued to communicate about the price increase via CW-6.

427.    On October 5, 2012, G&W announced its price increases in notifications to its customer. Perrigo followed suit on December 4, 2012 and Actavis raised its prices for the 12.5 mg dosage on February 12, 2013 and for the 25 mg dosage on April 3, 2013.

428.    G&W, Actavis, and Perrigo were not satisfied with these coordinated price increases. By spring 2013, they wanted to increase prices even further.

429.    On March 26, 2013, G&W's Orlofski had a call with Doug Boothe, who was at the time the Executive Vice President and General Manager of Perrigo. On the same day, Vogel-Baylor passed messages to T.P. at Perrigo via CW-6. During these calls they discussed future price increases for Promethazine suppositories.

430.    On April 11, 2013, G&W's Vogel-Baylor had a call with Rick Rogerson at Actavis and Perrigo's T.P. had a call with M.D. at Actavis.

431.    On April 17, 2013, G&W increased its WAC price from $38.99 to $116.97.

432.    On June 3 and June 4, 2013, Vogel-Baylor had a call with Rogerson.

433.   On June 5, 2013, Actavis matched G&W's increased WAC price.

434.   On July 30, 2013 Perrigo notified its customers that it would increase its WAC price to match G&W and Actavis, and Vogel-Baylor had several calls directly with T.P. at Perrigo.

435.   Thereafter, G&W continued to decline to bid on any new opportunities for Promethazine, so as not to disrupt the market share balance it had established via collusion. ▬▬ ▬▬▬▬▬▬▬▬▬▬▬ noted G&W's Vogel-Baylor on May 30 2013.

### 36. Ciclopirox Cream and Mometasone Furoate cream, ointment and solution (G&W, Glenmark, Perrigo)

436.   Ciclopirox Olamine Cream, also known by the brand name Loprox, is an antifungal medicine.

437.   Mometasone Furoate ("Mometasone"), also known by the brand name Elocon, is a medium-strength corticosteroid used to treat skin conditions such as eczema, psoriasis, allergies, and rashes. Mometasone is available in several forms, including cream, ointment, and solution

438.   May 2013, the primary competitors for Ciclopirox Cream were Glenmark (44% market share), Perrigo (38%), and G&W (16%). The same three manufacturers sold the various formulations of Mometasone.

439.   Beginning as early as May 2, 2013, Glenmark began communicating with its competitors, including G&W, to coordinate its May 2013 price increases. Over the next several weeks, CW-5 and Jim Brown, a senior sales executive at Glenmark, had multiple calls with Vogel-Baylor of G&W during which they discussed and agreed to increase prices on Ciclopirox Cream and the various formulations of Mometasone. Notably, prior to these calls, Vogel-Baylor had never spoken to Brown before, according to the available phone records

FILED WITH REDACTIONS – PUBLIC VERSION

440.    Vogel-Baylor, as she had done in the past, used her contact, CW – 6 – then at Aurobindo – to communicate with T.P. of Perrigo regarding the increases. At this time, G&W and Aurobindo had no products that overlapped and CW-6 and Vogel-Baylor were not social friends.

441.    As a result of these conversations, Glenmark increased prices on Ciclopirox Cream and Mometasone Cream, Ointment, and Solution on May 16, 2013.  Perrigo later joined with an increase on Ciclopirox Cream.

442.    By May 23, 2013, Vogel-Baylor had written plans for the G&W price increases and was ready to discuss them with Glenmark. She spoke with CW-5 and Jim Brown at Glenmark on May 29, 2013, and later in the day G&W finalized the price increase notifications for Ciclopirox cream.  Vogel-Baylor spoke again with Brown on May 30, and then G&W joined the Mometasone price increases on June 4, 2013.

443.    On June 7, 2013. CW-5 told his Glenmark colleagues Brown and Blashinsky to deliberately send a high Mometasone bid to a customer so that G&W could keep that business at elevated prices.

**37.  Ethambutol HCL tablets (G&W, Lupin)**

444.    Defendant Orlofski of G&W had a long-standing relationship with David Berthold, a senior sales executive at Defendant Lupin. It was Berthold who first introduced Orlofski and Vogel-Baylor to CW-6 of Fougera. Lupin and G&W overlapped on only a single product during the time period relevant to this complaint: Ethambutol hydrochloride tablets.

445.    These tablets, known by the brand name Myambutol, are used to treat tuberculosis. In late 2012, G&W and Lupin were the two main generic manufacturers of the drug.

446.    On November 15, 2012, Defendants Orlofski and Vogel-Baylor of G&W exchanged several calls with David Berthold of Lupin to discuss Ethambutol price increases. At the same time, Berthold was keeping Kevin Green, a sales executive at Teva, apprised of his

**FILED WITH REDACTIONS – PUBLIC VERSION**

discussions with G&W. G&W and Lupin continued to talk through the end of November and early December, 2012.

447.     On December 17, 2012, Berthold received an email with the final papers for Lupin's price increase, to be announced the following day.

448.     Between December 17, 2012 and December 19, 2012, Berthold again exchanged several calls and text messages with Orlofski and Vogel-Baylor.

449.     By January 3, 2013, G&W began telling customers that it was about to announce its own price increases.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## THE STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

**A.    The statutes of limitations did not begin to run because Plaintiffs did not and could not discover Defendants' unlawful conspiracy**

450.    Plaintiffs had no knowledge of the specific events alleged in the fact sections B to O in this Complaint or of facts sufficient to place them on inquiry notice of the claims set forth herein, until, at the earliest, June 10, 2020. Prior to that time, no information available to Plaintiffs was sufficient to suggest Defendants' conduct relating to the Drugs at Issue newly identified in this complaint.

451.    Plaintiffs had no contact or interaction with any of the Defendants in this case by which they could have discovered Defendants' conspiracy. Defendants maintained during the conspiracy period (and some continue to maintain) that they are in compliance with their own antitrust policies and do not  and have not engaged in any form of price-fixing, including customer allocation, market allocation, and coordinated price increases.

452.    For these reasons, the statutes of limitations as to Plaintiffs' claims under the federal and state laws identified herein did not begin to run, and have been tolled, with respect to the claims that Plaintiffs have alleged in this Complaint.

**B.    Fraudulent concealment tolled the statutes of limitations**

453.    In the alternative, application of the doctrine of fraudulent concealment tolled the statutes of limitations as to the claims asserted by Plaintiffs.

454.    As discussed above, the Defendants often gave pretextual reasons for price increases. For example, during an August 11, 2015 earnings call, Dilip Shanghvi, the Managing Director at Sun Pharmaceutical Industries Ltd., misleadingly discussed "competitive pressure on some of the products…where competitive intensity has increased," when in fact, Sun was engaged in a conspiracy to lessen competitive forces and inflate prices.

**FILED WITH REDACTIONS – PUBLIC VERSION**

455.     Mylan has also released similarly false and misleading statements. On August 14,

2019, Mylan stated:

> With assistance from outside counsel we thoroughly investigated
> allegations made against our company and employees in the civil
> complaint filed by various state attorneys general, including the
> most recent allegation relating to obstruction. We have not found
> any evidence to corroborate the allegations.

456.     This statement is false because a "thorough" investigation would confirm that

Mylan did have communications with competitors on the dates alleged, so it cannot be true that

Mylan did not find "any" evidence.  These types of false statements and others made by

Defendants helped conceal the illegal conspiracy entered into by Defendants.

457.     Defendants' misrepresentations regarding their price changes were intended to

lull Plaintiffs and the Classes into accepting price hikes as a normal result of competitive and

economic market trends rather than as the consequence of Defendants' collusive acts. The public

statements made by Defendants were designed to mislead Plaintiffs and the Classes into paying

unjustifiably higher prices for generic drugs.

458.     Because of the deceptive practices and techniques of secrecy employed by

Defendants and their co-conspirators to conceal their illicit conduct, Plaintiffs and the Classes

could not have discovered the details of the conspiracy alleged herein at an earlier date by the

exercise of

459.     Therefore, the running of any statutes of limitations has been tolled for all claims

alleged by Plaintiffs and the Classes as a result of Defendants' anticompetitive and unlawful

conduct. Despite the exercise of reasonable diligence, Plaintiffs and Members of the Classes were

unaware of Defendants' unlawful conduct and did not know that they were paying

supracompetitive prices throughout the United States during the Class Period.

**FILED WITH REDACTIONS – PUBLIC VERSION**

460. For these reasons, Plaintiffs' claims are timely under all of the federal, state and common laws identified herein.

461. Additionally, this Complaint alleges a continuing course of conduct (including conduct within the limitations periods), and Defendants' unlawful conduct has inflicted continuing and accumulating harm within the applicable statutes of limitations. Thus, Plaintiffs and the members of the Damages Class can recover for damages that they suffered during any applicable limitations period.

## DEFENDANTS' ANTITRUST VIOLATIONS

462. During the Class Period, set forth below, Defendants engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers, rig bids, and fix, raise, and/or stabilize prices for the Drugs at Issue sold in the United States.

463. In formulating and effectuating the contract, combination or conspiracy, Defendants:

    (a)    participated in meetings and conversations regarding the prices of the Drugs at Issue;

    (b)    agreed during those meetings and conversations to charge prices at specified levels and otherwise to increase and/or maintain prices of the Drugs at Issue sold in the United States;

    (c)    agreed during those meetings and conversations to allocate customers, rig bids, and fix the price of the Drugs at Issue; and

    (d)    issued price announcements and charged contract prices in accordance with their agreements.

464. Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

465.    Defendants' contract, combination and conspiracy constitutes an unreasonable restraint of trade and commerce in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) and the laws of various State Damages Jurisdictions enumerated below.

466.    As a result of Defendants' unlawful conduct, Plaintiffs and the other members of the Classes have been injured in their business and property in that they have paid more for the Drugs at Issue than they would have paid in a competitive market. Wholesalers who purchased directly from Defendants were able to pass on overcharges to Plaintiff pharmacies, who have no meaningful ability to set their own resale / retail prices due to the automated and contract-bound nature of the modern pharmaceutical supply chain. The impairment of generic competition at the direct purchaser level caused similar injuries to all privately-owned pharmacies, who were equally denied the opportunity to purchase less expensive generic versions of the drugs.

467.    The unlawful contract, combination and conspiracy has had the following effects, among others:

    (a)    price competition in the markets for the Drugs at Issue have been artificially restrained;

    (b)    prices for the Drugs at Issue sold by Defendants have been raised, fixed, maintained, or stabilized at artificially high and non-competitive levels; and

    (c)    pharmacy purchasers of the Drugs at Issue sold by Defendants have been deprived of the benefit of free and open competition in the market for the Drugs at Issue.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## CLASS ACTION ALLEGATIONS

468.    Plaintiffs bring this action on behalf of themselves and on behalf of two classes:

(1) a class seeking injunctive relief under federal law:
the "**Pharmacy and Hospital Nationwide Class**"

(2) a class seeking all remedies available under state antitrust and consumer protection laws, also known as "unfair or deceptive trade practices" laws, as well as state common law:
the "**Pharmacy and Hospital Damages Class**"

469.    **Pharmacy and Hospital Nationwide Class**. Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, seeking equitable and injunctive relief on behalf of the following class (the "Nationwide Class"):

> All dispensers of drugs in the United States that purchased one or more of the generic Drugs at Issue in this complaint from January 1, 2010 through the present.

> This class excludes: (a) Defendants, their officers, directors, management, employees, subsidiaries and affiliates; (b) entities owned in part by judges or justices involved in this action or any members of their immediate families; (c) all pharmacies owned or operated by publicly traded companies.

> The Drugs at Issue are listed in Appendix A to this complaint.

470.    **Pharmacy and Hospital Damages Class**. Plaintiffs also bring this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages pursuant to the common law of unjust enrichment and the state antitrust, unfair competition, and consumer protection laws of the states and territories listed

**FILED WITH REDACTIONS – PUBLIC VERSION**

below (the "State Damages Jurisdictions")22 on behalf of the following class (the "Damages

Class"):

> All dispensers of drugs (including hospitals and independent
> pharmacies), in the State Damages Jurisdictions that purchased
> Defendants' generic Drugs at Issue from January 1, 2010 through
> the present.
>
> This class excludes:  (a) Defendants, their officers, directors,
> management, employees, subsidiaries and affiliates; (b) any
> entities owned in part by judges or justices involved in this action
> or any members of their immediate families; (c) all pharmacies
> owned or operated by publicly traded companies.
>
> The Drugs at Issue are listed in Appendix A to this complaint.

471.    The Nationwide Class and the Damages Class are referred to herein as the

"Classes."   While Plaintiffs do not know the exact number of the members of the Classes,

Plaintiffs believe there are thousands of members in each Class.

472.    Common questions of law and fact exist as to all members of the Classes. This is

particularly true given the nature of Defendants' conspiracy, which was generally applicable to all

the members of both Classes, thereby making appropriate relief with respect to the Classes as a

whole. Such questions of law and fact common to the Classes include, but are not limited to:

> (a)      Whether Defendants and their co-conspirators engaged in a
>          conspiracy to fix, raise, maintain and/or stabilize prices of Drugs at
>          Issue and/or engaged in market allocation for Drugs at Issue sold
>          in the United States;
>
> (b)      The duration of the conspiracy;

---

22 The State Damages Jurisdictions, for purposes of this complaint, are: Alabama, Alaska,
Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho,
~~Illinois~~, Iowa, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota,
Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico,
New York, North Carolina, North Dakota, Oregon, Pennsylvania, Rhode Island, ~~South Carolina~~,
South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia,
Wisconsin and Wyoming as well as the District of Columbia and Puerto Rico.

FILED WITH REDACTIONS – PUBLIC VERSION

(c)     Whether the conspiracy violated the Sherman Act, state antitrust and unfair competition laws, and/or state consumer protection laws

(d)     Whether Defendants unjustly enriched themselves to the detriment of the Plaintiffs and the members of the Classes;

(e)     Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to Plaintiffs and the members of the Classes;

(f)     The effect of the conspiracy on the prices of Drugs at Issue sold in the United States during the Class Period;

(g)     Whether the Defendants and their co-conspirators actively concealed, suppressed, and omitted to disclose material facts to Plaintiffs and members of the Classes concerning Defendants' unlawful activities to artificially inflate prices for Drugs at Issue, and/or fraudulently concealed the unlawful conspiracy's existence from Plaintiffs and the other members of the Classes;

(h)     The appropriate injunctive and related equitable relief for the Nationwide Class; and

(i)     The appropriate class-wide measure of damages for the Damages Class.

473.     Plaintiffs' claims are typical of the claims of the members of the Classes. Plaintiffs and all members of the Classes are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Defendants' Drugs at Issue. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Classes.

474.     Plaintiffs will fairly and adequately protect the interests of the Classes. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Classes. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

**FILED WITH REDACTIONS – PUBLIC VERSION**

475.     The questions of law and fact common to the members of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

476.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated entities to prosecute their common claims in this single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured hospitals and pharmacies with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action. The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## CAUSES OF ACTION

477.    As to the overarching conspiracy in which all Defendants participated, and as to each drug-specific conspiracy in which certain Defendants participated as alleged above, Plaintiffs seek relief under the laws specified in the Counts below.

### COUNT 1
### Violation of Sections 1 and 3 of the Sherman Act—Injunctive Relief
*(on behalf of Plaintiffs and the Nationwide Class)*

478.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue listed in Appendix A to this complaint. In the alternative, this count is brought against each of the Defendants listed in the specific drug conspiracies in Appendix A, for their participation in sub-conspiracies relating to the drugs listed.

479.    During the Class Period, Defendants and their unnamed co-conspirators entered into and engaged in a "contract, combination, or conspiracy" in unreasonable "restraint of trade" in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1, 3).   Defendants' fair share conspiracy is a per se violation of the federal antitrust laws.

480.    Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially allocate customers, rig bids and raise, maintain and fix prices for generic Drugs at Issue, thereby creating anticompetitive effects.

481.    The acts done by each of the Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

**FILED WITH REDACTIONS – PUBLIC VERSION**

482.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated pharmacies and hospitals in the Nationwide Class have been harmed by being forced to pay inflated, supracompetitive prices for the generic Drugs at Issue.

483.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the markets for the Drugs at Issue has been restrained, suppressed, and/or eliminated in the United States;

(b)    Prices for the Drugs at Issue provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)    Plaintiffs and members of the Nationwide Class have been deprived of the benefits of free and open competition.

484.    Plaintiffs and members of the Nationwide Class have been injured and will continue to be injured in their business and property by paying more for the Defendants' Drugs at Issue than they would have paid and will pay in the absence of the conspiracy.

485.    Plaintiffs must continue purchasing the Drugs at Issue in order to continue to operate their businesses.

486.    Plaintiffs and members of the Nationwide Class are entitled to an injunction against Defendants, preventing and restraining the continuing violations alleged herein.

### COUNT 2
### Violation of State Antitrust Statutes[23]
(on behalf of Plaintiffs and the Damages Class)

487.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of the Drugs at Issue listed in Appendix A to this complaint.

488.    During the Class Period, Defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy with respect to the sale of the Drugs at Issue in unreasonable restraint of trade and commerce and in violation of the various state antitrust and other statutes set forth below. In the alternative, this count is brought against each of the Defendants listed in the specific drug conspiracies in Appendix A, for their participation in sub-conspiracies relating to the drugs listed.

489.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and members of the Damages Class have been injured in their business and property and are threatened with further injury.

490.    In addition, Defendants have profited significantly from the conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of plaintiffs and the members of the Damages Class.

491.    Accordingly, plaintiffs and the members of the Damages Class in each of the following jurisdictions seek damages (including statutory damages where applicable), to be

---

[23] Statutory antitrust violations are alleged herein for the following jurisdictions: Arizona, California, Connecticut, District of Columbia, ~~Illinois~~, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Vermont, West Virginia and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, injunctive relief, including restitution and/or disgorgement, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the following state laws.

492.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the following state antitrust statutes, and plaintiffs seek all relief available under such statutes:

**FILED WITH REDACTIONS – PUBLIC VERSION**

| State | Antitrust Statute |
|---|---|
| Arizona | Arizona Revised Statutes, § 44-1401, *et seq* |
| California | Cal. Bus. & Prof. Code §16720; treble damages and cost of suit, including fees, pursuant to § 16750(a) |
| Connecticut | Conn. Gen. Stat. § 35-26 and § 35-28. Plaintiffs and the Classes seek all relief available under Conn. Gen. Stat. § 35-34 and § 35-35 for all purchases on or after July 10, 2017 |
| District of Columbia | District of Columbia Code § 28-4501 |
| ~~Illinois~~[24] | ~~Illinois Antitrust Act (740 Illinois Compiled Statutes 10/1, et seq.)~~ |
| Iowa | Iowa Code § 553.1, et seq. |
| Kansas | Kansas Statutes § 50-101 |
| Maine | Maine Rev. Stat. 10, § 1101, et seq |
| Maryland | For violations of Md. Code, Com. Law § 11-204(a)(1). Plaintiffs and the Classes seek all relief available under Md. Code, Com. Law § 11-209(b) for all purchases on or after October 1, 2017 |
| Michigan | Michigan Compiled Laws § 445.771, et seq. |
| Minnesota | Minnesota Statutes § 325D.49, et seq. |
| Mississippi | Mississippi Code § 75-21-1, et seq. |
| Nebraska | Nebraska Revised Statutes § 59-801, et seq. |
| Nevada | Nevada Revised Statutes § 598A.010, et seq. |
| New Hampshire | New Hampshire Revised Statutes § 356:1, et seq. |
| New Mexico | New Mexico Statutes § 57-1-1, et seq. |
| New York | New York General Business Law § 340, et seq. Defendants' conduct is a per se violation of the statute. |
| North Carolina | North Carolina General Statutes § 75-1, et seq. |
| North Dakota | North Dakota Century Code § 51-08.1-01, et seq. |
| Oregon | Oregon Revised Statutes § 646.705, et seq. |
| Rhode Island | for all purchases on or after July 15, 2013 pursuant to the Rhode Island Antitrust Act, Rhode Island General Laws § 6-36-1, et seq. |
| South Dakota | South Dakota Codified Laws § 37-1-3.1, et seq. |
| Tennessee | Tennessee Code § 47-25-101, et seq. |
| Vermont | Vermont Stat. 9 § 2453, et seq. |
| West Virginia | West Virginia Code § 47-18-1, et seq. |
| Wisconsin | Wisconsin Statutes § 133.01, et seq. |

**FILED WITH REDACTIONS – PUBLIC VERSION**

493.     As to All Jurisdictions Above: Plaintiffs and members of the Damages Class in each of the above jurisdictions have been injured in their business and property by reason of Defendants' unlawful combination, contract, conspiracy and agreement. Plaintiffs and members of the Damages Class have paid more for generic Drugs at Issue than they otherwise would have paid in the absence of Defendants' unlawful conduct. This injury is of the type the antitrust laws of the above states were designed to prevent and flows from that which makes Defendants' conduct unlawful.

494.     In addition, Defendants have profited significantly from the aforesaid conspiracy. Defendants' profits derived from their anticompetitive conduct come at the expense and detriment of Plaintiffs and members of the Damages Class.

495.     Accordingly, Plaintiffs and members of the Damages Class in each of the above jurisdictions seek damages (including statutory damages where applicable), to be trebled or otherwise increased as permitted by a particular jurisdiction's antitrust law, injunctive relief, including restitution and/or disgorgement, and costs of suit, including reasonable attorneys' fees, to the extent permitted by the above state laws.

---

[24] Plaintiffs acknowledge that this claim was dismissed with prejudice by the Court's February 15, 2019 Order (16-md-2724 Dkt. 858) and reassert the claim here solely for purposes of preservation for appeal.

**FILED WITH REDACTIONS – PUBLIC VERSION**

*COUNT 3*
*Violation of State Consumer Protection Statutes* [25]
*(on behalf of Plaintiffs and the Damages Class)*

496.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This count is brought against all Defendants for their participation in an overarching conspiracy to fix, raise and/or stabilize the prices of Drugs at Issue listed in Appendix A to this complaint. In the alternative, this count is brought against each of the Defendants listed in the specific drug conspiracies in Appendix A, for their participation in sub-conspiracies relating to the drugs listed.

497.    During the Class Period, Defendants marketed, sold, or distributed generic Drugs at Issue in each of the states listed below,

498.    Defendants engaged in unfair competition or unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection and unfair competition statutes listed below. Defendants knowingly agreed to, and did in fact, act in restraint of trade or commerce by affecting, fixing, controlling, and/or maintaining at non-competitive and artificially inflated levels, the prices at which generic Drugs at Issue were sold in each of the states listed below.

499.    Defendants' illegal conduct had the following substantial effects on commerce and generic drug purchasers:  (1) price competition for the Drugs at Issue was restrained and/or eliminated throughout the states listed below; (2) prices of the generic Drugs at Issue were raised, fixed, maintained, and stabilized at artificially high levels throughout the states listed below; (3)

---

[25] Statutory consumer protection / deceptive trade violations are alleged herein for the following jurisdictions: Alaska, Arkansas, California, Colorado, Delaware, Florida, ~~Georgia~~, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Rhode Island, ~~South Carolina~~, South Dakota, ~~West Virginia~~ and Wisconsin.

**FILED WITH REDACTIONS – PUBLIC VERSION**

Plaintiffs and members of the Damages Class, who resided in the states listed below and/or purchased the Drugs at Issue in the states listed below were deprived of free and open competition; and (4) Plaintiffs and members of the Damages Class paid supracompetitive, artificially inflated prices for the Drugs at Issue, in New Hampshire.

500.    Defendants deceived Plaintiffs and/or class members in each state into believing that the Drugs at Issue were competitively priced. Defendants deliberately failed to disclose material facts to Plaintiffs and members of the Damages Class concerning Defendants' unlawful activities and artificially inflated prices for generic Drugs at Issue. Defendants misrepresented to all purchasers during the Class Period that Defendants' generic Drugs at Issue prices were competitive and fair by not disclosing the nature of their overarching and individual agreements in restraint of trade. Defendants and their co-conspirators made public statements about the prices of the Drugs at Issue that either omitted material information that rendered the statements that they made materially misleading or affirmatively misrepresented the real cause of price increases for the Drugs at Issue; and Defendants alone possessed material information that was relevant to purchasers, but failed to provide the information. As a direct and proximate result of Defendants' willful, unconscionable and deceptive commercial practices Plaintiffs and members of the Damages Class suffered an ascertainable loss of money or property.

501.    Plaintiffs and members of the Damages Class lacked any meaningful choice in purchasing the generic Drugs at Issue because they were unaware of the unlawful overcharge, and there was no alternative source of supply through which Plaintiffs and members of the Damages Class could avoid the overcharges. Defendants' conduct with regard to sales of generic Drugs at Issue, including their illegal conspiracy to secretly fix the price of the Drugs at Issue at supracompetitive levels and overcharge generic drug purchasers, was substantively

FILED WITH REDACTIONS – PUBLIC VERSION

unconscionable because it was one-sided and unfairly benefited Defendants at the expense of Plaintiffs and the public. Defendants took grossly unfair advantage of Plaintiffs and members of the Damages Class. The suppression of competition that has resulted from Defendants' conspiracy has ultimately resulted in unconscionably higher prices such that there was a gross disparity between the price paid and the value received for the Drugs at Issue.

502.    Defendants' price-fixing conspiracy could not have succeeded absent deceptive conduct by Defendants to cover up their illegal acts. Secrecy was integral to the formation, implementation and maintenance of Defendants' price-fixing conspiracy. Defendants committed inherently deceptive and self-concealing actions, of which Plaintiffs and members of the Damages Class could not possibly have been aware.

503.    Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their price increases. Defendants' public statements concerning the price of generic Drugs at Issue created the illusion of competitive pricing controlled by market forces rather than supracompetitive pricing driven by Defendants' illegal conspiracy. Moreover, Defendants deceptively concealed their unlawful activities by mutually agreeing not to divulge the existence of the conspiracy to outsiders.

504.    Defendants took efforts to conceal their illegal agreements from Plaintiffs and members of the Damages Class.

**FILED WITH REDACTIONS – PUBLIC VERSION**

| State | Plaintiffs seek all relief available under consumer protection statutes: |
|---|---|
| Alaska | Alaska Statute § 45.50.471, et seq |
| Arkansas | Arkansas Code § 4-88-107(a)(10), against all Defendants; Arkansas Code § 4-88-303, against Defendants that increased prices by more than 10% from January 3 to February 2, 2014, or from February 18 to March 20, 2015. |
| California | Cal. Bus. & Prof. Code § 17200 *et seq.*, incl. §§ 17200.31; 17203; and 17204 |
| Colorado | Colorado Rev. Stat. § 6-1-101, et seq. |
| Delaware | Delaware Consumer Fraud Act, 6 Del. Code § 2511, et seq. |
| Florida | Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq. |
| ~~Georgia~~ | ~~Uniform Deceptive Trade Practices Act, Georgia Code § 10-1-370~~ |
| Minnesota | Uniform Deceptive Trade Practices Act, Minn. Stat. § 325D.43, et seq. |
| Nebraska | Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601, et seq. |
| New Hampshire | N.H. Rev. Stat. § 358-A:1, et seq. |
| New Mexico | Defendants' acts resulted in a gross disparity between the value received by Plaintiffs and the prices paid by them for generic Drugs at Issue in violation of N.M.S.A. Stat. § 57-12-3 and N.M.S.A., § 57-12-2E. |
| New Jersey | N.J. Statutes § 56:8-1, et seq., against all Defendants; N.J. Statutes § 56:8-107 against Defendants that increased prices by more than 10% from October 27 to November 26, 2012, from January 2 to February 1, 2014, or from January 26 to February 25, 2015. |
| New York | N.Y. Gen. Bus. Law § 349(h). |
| North Carolina | North Carolina Gen. Stat. § 75-1.1, *et seq.* Additionally, Defendants charged "unreasonably excessive prices" in violation of North Carolina. Gen. Stat. § 75-38 for sales in North Carolina in the 45 days after April 28, 2014, January 26, 2015, October 1, 2015, and January 20, 2016. |
| North Dakota | North Dakota Unlawful Sales or Advertising Practices Statute, N.D. Century Code § 51-15-01, *et seq.* |
| ~~South Carolina~~ | ~~South Carolina Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10~~ |
| South Dakota | South Dakota Deceptive Trade Practices and Consumer Protection Statute, S.D. Codified Laws § 37-24-1, *et seq.* |
| ~~West Virginia~~ | ~~West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-6-101~~ |
| Wisconsin | Wisconsin Consumer Protection Statutes, Wisc. Stat. § 100.18, *et seq.* |

**FILED WITH REDACTIONS – PUBLIC VERSION**

**COUNT 4**
**Unjust Enrichment**
*(on behalf of Plaintiffs and the Damages Class)*

505.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth herein. This claim is pleaded in the alternative to the other claims in this Complaint. This claim is brought under the equity precedents of each of the State Damages Jurisdictions.

506.    Defendants have unlawfully benefited from their sales of generic Drugs at Issue (as listed in Appendix A to this complaint) because of the unlawful and inequitable acts alleged in this Complaint. Defendants unlawfully overcharged Plaintiffs and Class member pharmacies and hospitals, who purchased generic Drugs at Issue at prices that were more than they would have been but for Defendants' unlawful actions. Pharmacies and hospitals are intended purchasers of the Drugs at Issue.

507.    Defendants' financial benefits resulting from their unlawful and inequitable acts are traceable to overpayments by Plaintiffs and members of the Damages Class.

508.    Plaintiffs and the Damages Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges, to the economic detriment of Plaintiffs and the Damages Class.

509.    Defendants have been enriched by revenue resulting from unlawful overcharges for generic Drugs at Issue while Plaintiffs have been impoverished by the overcharges they paid for generic Drugs at Issue imposed through Defendants' unlawful conduct. Defendants' enrichment and Plaintiffs' impoverishment are connected.

510.    There is no justification for Defendants' retention of, and enrichment from, the benefits they received, which caused impoverishment to Plaintiffs and the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices that inured to Defendants'

**FILED WITH REDACTIONS – PUBLIC VERSION**

benefit, and it would be inequitable for Defendants to retain any revenue gained from their

unlawful overcharges. Plaintiffs did not interfere with Defendants' affairs in any manner that

conferred these benefits upon Defendants.

511.    The benefits conferred upon Defendants were not gratuitous, in that they

constituted revenue created by unlawful overcharges arising from Defendants' illegal and unfair

actions to inflate the prices of generic Drugs at Issue.

512.    The benefits conferred upon Defendants are measurable, in that the revenue

Defendants have earned due to their unlawful overcharges of generic Drugs at Issue are

ascertainable by review of sales records.

513.     Defendants have paid no consideration to any other person for any of the

unlawful benefits they received from Plaintiffs and the Damages Class with respect to

Defendants' sales of the Drugs at Issue.

514.    The economic benefit of overcharges and monopoly profits derived by

Defendants through charging supracompetitive and artificially inflated prices for generic Drugs at

Issue is a direct and proximate result of Defendants' unlawful practices.

515.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and

the Damages Class, because Plaintiffs and the Damages Class paid supracompetitive prices during

the Class Period, inuring to the benefit of Defendants.

516.    It would be inequitable under unjust enrichment principles under the law of the

District of Columbia and the laws of all states and territories of the United States, except Ohio

and Indiana, for Defendants to be permitted to retain any of the overcharges for generic Drugs at

Issue derived from Defendants' unlawful, unfair and unconscionable methods, acts, and trade

practices alleged in this Complaint.

**FILED WITH REDACTIONS – PUBLIC VERSION**

517.     Defendants are aware of and appreciate the benefits bestowed upon them by Plaintiffs and the Damages Class. Defendants consciously accepted the benefits and continue to do so as of the date of this filing, as prices for many of the Drugs at Issue remain inflated above pre-conspiracy levels.

518.     Defendants should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the Damages Class all unlawful or inequitable proceeds they received from their sales of the generic Drugs at Issue.

519.     A constructive trust should be imposed upon all unlawful or inequitable sums received by Defendants traceable to indirect purchases of generic Drugs at Issue by Plaintiffs and the Damages Class. Plaintiffs and the Damages Class have no adequate remedy at law.

FILED WITH REDACTIONS – PUBLIC VERSION

## **REQUEST FOR RELIEF**

Plaintiffs request that:

    a.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that reasonable Notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class;

    b.   The Defendants' unlawful conduct be decreed: (i) a violation of Section 1 of the Sherman Act; (iii) an unlawful combination, agreement, understanding and/or concert of action in violation of the state antitrust and unfair competition and consumer protection laws as set forth herein; and (iv) acts of unjust enrichment by Defendants;

    c.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by state and federal laws, and that a judgment in favor of Plaintiffs and members of the Damages Class be entered against Defendants jointly and severally in an amount to be trebled to the extent such laws permit;

    d.   Plaintiffs and members of the Damages Class recover damages, to the maximum extent allowed by such laws, in the form of restitution and/or disgorgement of profits unlawfully obtained;

    e.   Plaintiffs and members of the Damages Class be awarded restitution, including disgorgement of profits Defendants obtained as a result of their acts of unfair competition and acts of unjust enrichment;

    f.   Defendants and their employees be permanently enjoined from continuing, maintaining or renewing the conduct alleged herein, or from entering into any other conspiracy having a similar purpose or effect;

    g.   Plaintiffs and members of the Classes be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

    h.   Plaintiffs and members of the Classes recover their costs of suit, including reasonable attorney fees, as provided by law; and

    i.   Plaintiffs and members of the Classes have such other and further relief as the case may require and the Court may deem just and proper.

**FILED WITH REDACTIONS – PUBLIC VERSION**

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: December 15, 2020                Respectfully submitted,

/s/  Peter Gil-Montllor                 /s/  Jonathan W. Cuneo

Peter Gil-Montllor                      Jonathan W. Cuneo
Christian Hudson                        Victoria Sims
**CUNEO GILBERT & LADUCA LLP**          **CUNEO GILBERT & LADUCA LLP**
16 Court Street, Suite 1012             4725 Wisconsin Ave., NW Suite 200
Brooklyn, NY 11241                      Washington, DC 20016
202-789-3960                            202-789-3960
pgil-montllor@cuneolaw.com              jonc@cuneolaw.com

                                        *Lead Counsel for the Indirect Reseller Plaintiffs*

**FILED WITH REDACTIONS – PUBLIC VERSION**

APPENDIX A:  DRUGS AT ISSUE IN THIS COMPLAINT

| Drug at Issue | Defendants<br>(and Co-Conspirators) |
|---|---|
| Adapalene cream | Perrigo, Sandoz/Fougera |
| Alclometasone dipropionate cream | Glenmark, Sandoz, Taro |
| Alclometasone dipropionate ointment | Glenmark, Sandoz, Taro |
| Ammonium lactate cream | Actavis, Perrigo, Taro |
| Ammonium lactate lotion | Actavis, Perrigo, Taro |
| Bromocriptine mesylate tabs | Mylan, Perrigo, Sandoz |
| Carbamazepine oral suspension | Taro, Wockhardt |
| Calcipotriene solution | Perrigo, Sandoz |
| Calcipotriene-Betamethasone dipropionate ointment | Perrigo, Sandoz |
| Cefpodoxime proxetil oral suspension | Aurobindo, Sandoz |
| Cefpodoxime proxetil tablets | Aurobindo, Sandoz |
| Ciclopirox olamine cream | Glenmark, G&W, Perrigo |
| Ciclopirox shampoo | Actavis, Perrigo, Sandoz |
| Ciclopirox solution | G&W, Perrigo, Sandoz |
| Clindamycin phosphate cream | Greenstone, Sandoz |
| Clindamycin phosphate gel | Greenstone, Sandoz |
| Clindamycin phosphate lotion | Greenstone, Sandoz |
| Clindamycin phosphate solution | Greenstone, Perrigo, Sandoz, Taro |
| Clotrimazole-Betamethasone dipropionate cream | Actavis, Sandoz/Fougera, Taro |
| Clotrimazole-Betamethasone dipropionate lotion | Sandoz/Fougera, Taro |
| Clotrimazole cream | Sandoz, Taro |
| Desonide lotion | Actavis, Sandoz/Fougera |
| Desoximetasone ointment | Glenmark, Sandoz, Taro |
| Erythromycin base/ethyl alcohol solution | Perrigo, Sandoz/Fougera, Wockhardt |
| Ethambutol hydrochloride tablets | G&W, Lupin |
| Fluocinolone acetonide cream | G&W, Sandoz/Fougera |
| Fluocinolone acetonide ointment | G&W, Sandoz/Fougera |
| Fluocinonide solution | Actavis, Sandoz/Fougera, Taro |
| Fluticasone propionate lotion | Glenmark, Perrigo, Sandoz |
| Griseofulvin microsize tablets | *Rising*, Sandoz |

FILED WITH REDACTIONS – PUBLIC VERSION

| | |
|---|---|
| Halobetasol propionate cream | G&W, Perrigo, Sandoz, Taro |
| Halobetasol propionate ointment | G&W, Perrigo, Taro |
| Hydrocortisone acetate suppositories | G&W, Perrigo |
| Methazolamide tablets | Perrigo, Sandoz |
| Methylphenidate hydrochloride ER tablets | *Mallinckrodt*, Sandoz |
| Methylphenidate hydrochloride IR tablets | Actavis, *Mallinckrodt*, Sandoz, Sun |
| Metronidazole .1% gel | Sandoz, Taro |
| Metronidazole .75% cream | Actavis, G&W, Sandoz/Fougera |
| Metronidazole .75% lotion | Actavis, G&W, Sandoz/Fougera |
| Mometasone furoate cream | Glenmark, G&W, Perrigo |
| Mometasone furoate ointment | Glenmark, G&W, Perrigo |
| Mometasone furoate solution | Glenmark, G&W, Perrigo |
| Nafcillin sodium injectable vials | Aurobindo, Sandoz |
| Oxacillin sodium injectable vials | Aurobindo, Sandoz |
| Phenytoin sodium capsules | Amneal, Mylan, Sun, Taro |
| Prochlorperazine maleate suppositories | G&W, Perrigo |
| Promethazine hydrochloride suppositories | Actavis, G&W, Perrigo |
| Tacrolimus ointment | Perrigo, Sandoz |
| Terconazole cream | Actavis, Taro |
| Triamcinolone acetonide cream | Perrigo, Sandoz/Fougera |
| Triamcinolone acetonide ointment | Perrigo, Sandoz/Fougera |
| Triamcinolone acetonide paste | *Rising,* Taro |

**FILED WITH REDACTIONS – PUBLIC VERSION**

APPENDIX B: MANUFACTURER DEFENDANTS IN IRP COMPLAINTS IN MDL 2724

| Defendants in drug-by-drug actions filed in 2017 | Defendants in 18-cv-2533 "Overarching" Complaint focused on Heritage | Defendants in 19-cv-6044 "Dec 2019" Complaint focused on Teva and Distributor Defendants | Defendants in this Complaint "Dec 2020" Complaint focused on Sandoz, Taro, G&W, and topical drugs |
|---|---|---|---|
| Actavis | Actavis | Actavis | Actavis |
| Akorn / Hi-Tech | | Akorn / Hi-Tech / Versapharm | |
| | | Alvogen | |
| | | Amneal | Amneal |
| Apotex | Apotex | Apotex | |
| Aurobindo | Aurobindo | Aurobindo | Aurobindo |
| | | Bausch / Valeant/ Oceanside | |
| Breckenridge | | Breckenridge | |
| | | Camber | |
| Citron | Citron | Citron | |
| Dr. Reddy's | Dr. Reddy's | Dr. Reddy's | |
| Glenmark | Glenmark | Glenmark | Glenmark |
| | | Kavod / Rising | |
| | | G&W | G&W |
| | | Greenstone / Pfizer | Greenstone / Pfizer |
| Heritage | Heritage | Heritage | |
| Impax | | | |
| Lannett | Lannett | Lannett | |
| Lupin | | Lupin | Lupin |
| Mayne | | Mayne | |
| Mylan / URL | Mylan | Mylan / URL | Mylan |
| Par | Par / Dava / Generics Bidco | Par / Dava / Endo / Generics Bidco | |
| Perrigo | Perrigo | Perrigo | Perrigo |
| Sandoz / Fougera | Sandoz / Fougera | Sandoz / Fougera | Sandoz / Fougera |
| Sun | Sun / Mutual | Sun / Mutual / Caraco | Sun |
| Taro | Taro | Taro | Taro |
| ~~Teligent~~ | | | |
| Teva | Teva / Pliva / Barr | Teva / Pliva / Barr | |
| West-Ward | West-Ward | | |
| Wockhardt / Morton Grove | | Wockhardt | Wockhardt |
| Upsher-Smith | | Upsher-Smith | |
| Zydus | Zydus | Zydus | |

FILED WITH REDACTIONS – PUBLIC VERSION